UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF OHIO

EASTERN DIVISION

- - -

REGINALD FOLKS,                    )
            Plaintiff,             )
                                   )
      v.                           )   Case No.  1:13-CV-2292
                                   )   Magistrate Judge
AARON PETITT,                      )   William H. Baughman, Jr.
            Defendant.             )

- - -

THE DEPOSITION OF OFFICER AARON PETITT
THURSDAY, APRIL 9, 2015

- - -

The deposition of OFFICER AARON PETITT, the
Defendant herein, taken as if upon cross-examination by
the Plaintiff, under the Federal Rules of Civil
Procedure, taken before me, Janet M. Hoffmaster,
Registered Professional Reporter and Notary Public in
and for the State of Ohio, pursuant to Notice, at the
Department of Law, Cleveland City Hall, 601 Lakeside
Avenue, Room 106, Cleveland, Ohio, commencing at 1:30
p.m., the day and date above set forth.

- - -

HOFFMASTER & BARBERIC, INC.
THE GRAY'S BLOCK
1360 WEST 9TH STREET, SUITE 440
CLEVELAND, OHIO  44113
(216) 621-2550
FAX: (216) 621-3377
1-888-595-1970

```
 1    APPEARANCES:

 2

      On behalf of the Plaintiff:
 3
            DAVID B. MALIK, ESQ.
 4          SARA GEDEON, ESQ.
            Law Office of David B. Malik & Associates
 5          Chester Professional Building
            8437 Mayfield Road, Suite 101
 6          Chesterland, OH  44026
            (440) 729-8260
 7

 8

      On behalf of the Defendants:
 9
            JOHN P. BACEVICE, ESQ.
10          Department of Law
            Cleveland City Hall
11          601 Lakeside Avenue, Room 106
            Cleveland, OH  44114
12          (216) 664-2807

13

14                        - - -

15    ALSO PRESENT:

16          Bob Aman, Professional Video Services

17                        - - -

18

19

20

21

22

23

24

25
```

**Hoffmaster & Barberic, Inc.**
**(216) 621-2550**

```
 1                          INDEX

 2                                        PAGES

 3   CROSS-EXAMINATION BY

 4        MR. MALIK                         4

 5                        - - -

 6

 7   PLAINTIFF'S EXHIBITS MARKED

 8        1                                34
          2                                61
 9        3                                91
          4                                94
10        5                                94
          6                                97
11        7                               101
          8                               102
12        9                               103
         10                               104
13       11                               106
         12                               111
14       13                               112

15                        - - -

16

17   OBJECTIONS BY

18       MR. BACEVICE     6(4), 7(3), 9(2), 11(2), 13(2),
                          15(2), 21, 23(4), 24(4), 26(2),
19                        27(3), 28(2), 29(2), 34, 35,
                          37(3), 41, 47(4), 48, 49, 52,
20                        55, 64(2), 65, 66(3), 70, 72,
                          77(2), 79, 80(3), 82(2), 83,
21                        84(3), 87, 88(3), 89(3), 90(2),
                          92, 93, 95, 97, 102, 104, 106,
22                        107(2), 108(3), 109(3), 110.
                          11(2), 112
23                        - - -

24

25
```

**Hoffmaster & Barberic, Inc.**
**(216) 621-2550**

```
 1                    OFFICER AARON PETITT
 2    the Defendant herein, called for examination by the
 3    Plaintiff, under the Rules, having been first duly
 4    sworn, as hereinafter certified, was deposed and said
 5    as follows:
 6                    CROSS-EXAMINATION
 7    BY MR. MALIK:
 8    Q.    Officer, for the record, would you please state
 9    your full name?
10    A.    My name is Aaron Joseph Petitt.
11    Q.    Presently what is your occupation?
12    A.    I'm a police officer with the City of Cleveland.
13    Q.    What is your weight?
14    A.    Approximately 175.
15    Q.    And what was your height in 2012?
16    A.    Five-seven, I believe.  5 foot, 7 inches.
17    Q.    Was your weight approximately the same in 2012
18    as it is today?
19    A.    Yes.
20    Q.    Did you consider yourself physically fit for
21    duty as a police officer on October 12th -- in October
22    of 2012?
23    A.    Yes.
24    Q.    Do you recall prior to October of 2012 when you
25    had passed a police physical?
```

1    **A.      Prior to graduation in the academy.**

2    Q.      And what year would that have been?

3    **A.      2008.**

4    Q.      Did you consider yourself emotionally fit for

5    duty in October of 2012?

6    **A.      Yes.**

7    Q.      Did the Cleveland Police Department measure

8    psychological fitness for duty when you came on the

9    force?

10   **A.      I don't know.**

11   Q.      Were you ever evaluated for psychological

12   fitness of duty by the City of Cleveland?

13   **A.      Yes.**

14   Q.      And when was that?

15   **A.      During screening procedures for the academy.**

16   Q.      And would that have been 2008?

17   **A.      2007.**

18   Q.      Thank you.

19          What type of screening procedures did the city

20   employ in 2007?

21   **A.      It was an interview.**

22   Q.      And who was that interview with?

23   **A.      I don't recall.**

24   Q.      And where was the interview conducted?

25   **A.      I don't recall.**

**Hoffmaster & Barberic, Inc.**
**(216) 621-2550**

1   Q.      Was it conducted by a psychologist?

2   **A.      I don't know.**

3   Q.      And who required you to go to the interview?

4   **A.      It was a pre-employment requirement.**

5   Q.      So that would have been the City of Cleveland?

6   **A.      Yes.**

7   Q.      Were you ever given any of the test results from

8   that interview?

9               MR. BACEVICE:              Objection.

10              You can answer.

11  **A.      Okay.  I don't believe so.**

12  Q.      Was it just the series of questions?

13              MR. BACEVICE:              Objection.

14              You can answer.

15  **A.      I don't recall.**

16  Q.      Were there -- was there any written tests that

17  you had to take?

18  **A.      Not --**

19              MR. BACEVICE:              Objection.

20              Go on.

21  **A.      Not during the interview period.**

22  Q.      Was there any psychological evaluation that was

23  written at any time during either pre-employment or

24  subsequent to you becoming a police officer?

25              MR. BACEVICE:              Objection.

1          Go on.

2  **A.     I don't -- I don't recall.**

3  Q.     Have you ever been referred to any mental health

4  worker for anything related to on-the-job issues?

5          MR. BACEVICE:          Objection.

6          Go ahead and answer.

7  **A.     No.**

8  Q.     Has anyone from the City of Cleveland ever told

9  you to adjust your attitude towards citizens or fellow

10 officers while acting as a police officer?

11         MR. BACEVICE:          Objection.

12         Go ahead.

13 **A.     Yes.**

14 Q.     And who was that?

15 **A.     Sergeant Sudy.**

16 Q.     And what year was that?

17 **A.     I believe 2010.**

18 Q.     And what were the circumstances surrounding

19 those comments by him?

20         MR. BACEVICE:          Can I, David,

21         just have a continuing objection to this

22         line?

23         MR. MALIK:             Sure.

24         MR. BACEVICE:          Thanks.

25         Go ahead.  Go ahead.

1    **A.      I don't recall the circumstances.**

2    Q.      When did you officially become a Cleveland

3    Police Officer?

4    **A.      2008.**

5    Q.      Did you submit recommendations or provide names

6    of others who recommended you for the job?

7    **A.      Yes, I did.**

8    Q.      And do you recall who those people were?

9    **A.      One person was First Sergeant Salinero.  I don't**

10   **recall the other recommendations I submitted.**

11   Q.      How do you spell his last name?

12   **A.      I don't know if I can give you the exact**

13   **spelling.  Should I -- I believe it's S-A-L-I-N-E-R-O.**

14   Q.      And how did you know him?

15   **A.      He was the first sergeant of the company I was**

16   **in in the military.**

17   Q.      And what company was that?

18   **A.      Bravo Company.**

19   Q.      And what year were you in that company --

20   **A.      From --**

21   Q.      -- or years?

22   **A.      From 2004 to 2006.**

23   Q.      Other than the sergeant, have you ever had

24   relatives or friends on the police force?

25   **A.      No, I have not.**

1    Q.    Did you consider Sergeant Salinero a friend?

2    **A.    He was not on the police force.**

3    Q.    You knew him primarily from your military

4    service?

5    **A.    Yes.**

6    Q.    And are you friends with him today?

7    **A.    Yes.**

8    Q.    Have you had any relatives or friends that

9    worked for the City of Cleveland prior to your

10   employment?

11            MR. BACEVICE:            Objection.

12                Go ahead.

13   **A.    No.**

14   Q.    What about during your employment?

15            MR. BACEVICE:            Same

16            objection.

17                Go ahead.

18   **A.    Yes, I have friends on the job.**

19   Q.    And are those fellow police officers?

20   **A.    Yes, they are.**

21   Q.    And were those police officers that you met

22   while you were a policeman as a Cleveland Police

23   Officer?

24   **A.    Yes.**

25   Q.    Other than Sergeant Salinero did anybody else

1   recommend you for the job as a Cleveland Police

2   Officer?

3   **A.      Yes.**

4   Q.      Who?

5   **A.      I don't recall the other recommendation letters**

6   **I submitted.**

7   Q.      Do you know who finally approved you for the job

8   as a Cleveland Police Officer?

9   **A.      No.**

10  Q.      Did you have any job interviews conducted by the

11  City of Cleveland or Cleveland Police Department prior

12  to being hired?

13  **A.      Yes.**

14  Q.      And do you know who conducted those interviews?

15  **A.      No.**

16  Q.      How many interviews would you say you had that

17  were pre-employment interviews for the police

18  department?

19  **A.      I don't recall.**

20  Q.      Were they all pre-employment interviews?

21  **A.      Yes.**

22  Q.      Were any performed by a psychologist?

23  **A.      I don't know.**

24  Q.      Well, did you ever see an independent doctor or

25  psychologist or psychiatrist of any sort prior to being

1    employed as a Cleveland Police Officer?

2    **A.    No.**

3    Q.    What was the first unit you entered into as a

4    Cleveland Police Officer?

5    **A.    Fourth District, basic patrol.**

6    Q.    As a Cleveland Police Officer are you required

7    to have a working knowledge of the department rules,

8    regulations, policies and procedures?

9              MR. BACEVICE:              Objection.

10             Go ahead.

11   **A.    I'm sorry.  Could you repeat the question,**

12   **please?**

13   Q.    As a Cleveland Police Officer are you required

14   to have a working knowledge of the department's rules,

15   regulations, policies and procedures?

16   **A.    Yes.**

17             MR. BACEVICE:              Objection.

18   BY MR. MALIK:

19   Q.    And did you in 2012?

20   **A.    Yes.**

21   Q.    Do you have an email address associated with the

22   police force?

23   **A.    No.**

24   Q.    Do you have a private email address?

25   **A.    Yes.**

1   Q.      Do you use that private email address for

2   anything related to your employment?

3   **A.      No.**

4   Q.      Do you have a LinkedIn or any other social media

5   accounts?

6   **A.      Yes.**

7   Q.      Which ones?

8   **A.      I have a Facebook account.**

9   Q.      And is it in your name?

10  **A.      Yes.**

11  Q.      How long have you had that account?

12  **A.      2005.**

13  Q.      You know who the plaintiff Reginald Folks is.

14  Correct?

15  **A.      Yes.**

16  Q.      Did you ever use your cell phone to talk about

17  Mr. Folks at any time?

18  **A.      No.**

19  Q.      Did you ever use your cell phone the night of

20  October 27th of 2012 when you had an encounter with

21  Mr. Folks that related to him?

22  **A.      No.**

23  Q.      Did you ever use email in any respect to talk

24  about Mr. Folks or the incident?

25  **A.      No.**

1  Q.    Have you willfully violated any rule,

2  regulation, policy or procedure of the Cleveland Police

3  Department?

4              MR. BACEVICE:            Objection.

5                  And, David, can I have a standing

6              objection --

7              MR. MALIK:            Yes.

8              MR. BACEVICE:            -- to all

9              questions about procedures --

10             MR. MALIK:            Sure.

11             MR. BACEVICE:             -- rules,

12             policies?

13                 But go ahead and answer.

14  **A.    No.**

15  Q.    Have you ever been told you had violated a

16  work-related rule, regulation, policy and procedure

17  willfully?

18  **A.    Yes.**

19  Q.    And who told you that?

20  **A.    Sergeant Peters.**

21  Q.    And when was that?

22  **A.    March of 2013.**

23  Q.    And do you know why he told you that?

24             MR. BACEVICE:            Objection, but

25             answer to the best of your ability.

1   **A.      Yes.**

2   Q.      Can you tell me why?

3   **A.      An officer called for assistance with a Code 1**

4   **assignment through radio.  I answered out for the**

5   **assignment.  I was ordered not to go and I responded to**

6   **assist.**

7   Q.      You went anyhow.  Correct?

8   **A.      Correct.**

9   Q.      Code 1's a priority assignment.  Correct?

10  **A.      Yes.**

11  Q.      What does Code 1 mean in police jargon?

12  **A.      It means it's the highest priority of**

13  **assignment.**

14  Q.      The person that -- strike that.

15          You had received a call prior -- strike that.

16          Did you get a call for the Code 1 first or a

17  call from Sergeant Peters first?

18  **A.      The call from radio first.**

19  Q.      Okay.  For the Code 1?

20  **A.      Yes.**

21  Q.      And then you got a call related to Sergeant

22  Peters?

23  **A.      Yes.**

24  Q.      And Sergeant Peters would have been your

25  supervisor.  Correct?

1  **A.      Yes.**

2  Q.      Did you tell Sergeant Peters you had a Code 1?

3  **A.      Yes.**

4  Q.      And what did he instruct you to do?

5  **A.      Not respond.**

6  Q.      Do you know why he instructed you not to

7  respond?

8              MR. BACEVICE:              Objection.

9              Foundation.

10                  But answer to the best of your

11              ability.

12  **A.      He believed I was needed elsewhere.**

13  Q.      Well, he felt his safety was in jeopardy.

14  Correct?

15              MR. BACEVICE:              Same

16              objection.

17                  Answer to the best of your ability.

18  **A.      I don't know.**

19  Q.      Were you never -- were you ever told he felt his

20  safety was in jeopardy?

21  **A.      Yes.**

22  Q.      Did you know that at the time he asked you to

23  respond?

24  **A.      No.**

25  Q.      Prior to responding to the Code 1 did you ever

1   ask Sergeant Peters what he needed or why he needed

2   you?

3   **A.      No.**

4   Q.      Would it have been within your responsibility as

5   a police officer to ask him why he needed you?

6   **A.      No.**

7   Q.      In 2012 were you a member of the Cleveland

8   Police Patrolmen's Association?

9   **A.      Yes.**

10  Q.      Are you a member today?

11  **A.      Yes.**

12  Q.      Have you continuously been a member even when

13  you were not on the police force?

14  **A.      No.**

15  Q.      There came a time when you resigned from the

16  police force.  Correct?

17  **A.      Correct.**

18  Q.      And at that time did you also stop your

19  membership in the CPPA?

20  **A.      Yes.**

21  Q.      And when did you continue with your relationship

22  with the CPPA?

23  **A.      When I came back to the Cleveland Police**

24  **Department.**

25  Q.      And when was that?

1    A.      September 2012.

2    Q.      When did you resign?

3    A.      2011.

4    Q.      Do you remember the month?

5    A.      I don't recall.

6    Q.      Do you know why you resigned?

7    A.      For a different position.

8    Q.      And where was that position?

9    A.      It was with Triple Canopy.

10   Q.      What is Triple Canopy?

11   A.      A contract company for the U.S. Department of

12   State.

13   Q.      And did it pay more money?

14   A.      Yes.

15   Q.      And was that the reason you resigned?

16   A.      Yes.

17   Q.      And so did you fill out an application with

18   Triple Canopy?

19   A.      Yes.

20   Q.      And where is Triple Canopy located?

21   A.      Reston, Virginia, I believe.

22   Q.      And what did you apply to do for them?

23   A.      Protective security detail.

24   Q.      Domestically or internationally?

25   A.      Internationally.

Page 18

1   Q.      And did you go to work for them?

2   **A.      Yes.**

3   Q.      And where did you -- what country did you go to

4   work for them in?

5   **A.      Iraq.**

6   Q.      And what years were you -- or what period of

7   time were you employed by Triple Canopy?

8   **A.      2011 to 2012.**

9   Q.      Did you have a contract with them?

10  **A.      Yes.**

11  Q.      Did the contract call for you protecting

12  individuals known as high asset targets?

13  **A.      Yes.**

14  Q.      Without divulging the actual client, what types

15  of people did you protect?

16  **A.      Political and state department personnel.**

17  Q.      When you worked for Triple Canopy were you

18  armed?

19  **A.      Yes.**

20  Q.      Did you have to undergo a psychological exam

21  prior to working for Triple Canopy?

22  **A.      Yes.**

23  Q.      And who conducted that psychological exam?

24  **A.      I don't recall.**

25  Q.      And where was it conducted?

Page 19

1    **A.     Over the phone.**

2    Q.     You were in Cleveland?

3    **A.     Yes.**

4    Q.     When you were armed, what weapons were you armed

5    with typically?

6    **A.     An M4 rifle, a Glock 19 pistol, a M249 machine**

7    **gun.**

8    Q.     Anything else?

9    **A.     No.**

10   Q.     What military experience did you have that would

11   qualify you for that job?

12   **A.     I was a sergeant in the First Ranger Battalion.**

13   Q.     Did you see active duty other than in the United

14   States?

15   **A.     Yes.**

16   Q.     Where did you see active duty?

17   **A.     Iraq and Afghanistan.**

18   Q.     How long were you in Iraq?

19   **A.     Two separate rotations for a total of 10 to 11**

20   **months, I believe.**

21   Q.     When was the first rotation?

22   **A.     2004.**

23   Q.     And where in Iraq were you?

24   **A.     In the area of Mosul.**

25   Q.     When was the second rotation?

1   **A.      2005 and 2006.**

2   Q.      And where were you located?

3   **A.      In the area of Ar Ramadi.**

4   Q.      So had your service ended in 2004 and then you

5   reenlisted for another tour of duty in 2005 and 2006,

6   or was it just one combined tour?

7   **A.      It was one combined tour.**

8   Q.      Did you enlist in the military?

9   **A.      Yes.**

10  Q.      With respect to Bravo Company was your

11  classification as a Ranger and your assigned company

12  units that you were in at the same time, or was your

13  Ranger unit separate from Bravo Company?

14  **A.      Bravo Company was a company inside of the Ranger**

15  **Battalion.**

16  Q.      Okay.  Where did you do your training for your

17  Ranger designation?

18  **A.      Primarily at Fort Benning, Georgia.**

19  Q.      And how long was that training?

20  **A.      Two different programs were, one was three weeks**

21  **and one was three months.**

22  Q.      What skills did you learn in the three-week

23  program?

24  **A.      None.**

25  Q.      What skills did you learn in the other program?

1    Three months, I think you said.

2    **A.      Mountaineering, small unit tactics, leadership.**

3    Q.      Were you injured at all when you were in the

4    military?

5    **A.      No.**

6    Q.      Why did you leave the military?

7    **A.      My contract expired.**

8    Q.      When you left the military, what was the first

9    job that you had?

10   **A.      Lifeguard.**

11   Q.      And where did you do that?

12   **A.      Various locations around Cleveland.**

13   Q.      How old were you?

14   **A.      21.**

15   Q.      After your lifeguarding, what did you do?

16   **A.      I became a police officer.**

17   Q.      Is City of Cleveland the only police department

18   you've worked for?

19   **A.      Yes.**

20   Q.      Is it the only police department that you've

21   applied for a job for?

22   **A.      Yes.**

23   Q.      Have you ever been turned down for any military

24   or law enforcement related job?

25              MR. BACEVICE:              Objection.

1          Go ahead and answer.

2   **A.      No.**

3   Q.      The first time you were a Cleveland Police

4   Officer, what years did that entail?

5   **A.      2008 'til 2011.**

6   Q.      And then the second time?

7   **A.      2012 to present.**

8   Q.      Do you recall when you came back on the job in

9   2012?

10  **A.      September.**

11  Q.      When you came back on the job in 2012, did you

12  have any retraining?

13  **A.      Yes.**

14  Q.      Can you tell me about that?

15  **A.      I went to a several day in-service course at the**

16  **academy.**

17  Q.      On what topic?

18  **A.      Primarily covering updates in laws and police**

19  **procedures.**

20  Q.      And do you know who that was taught by?

21  **A.      I don't recall.**

22  Q.      But it was through the Cleveland Police Academy?

23  **A.      Yes.**

24  Q.      So there should be a record of you attending

25  that academy?

1    **A.      Yes.**

2    Q.     And how long was that course in terms of days or

3    week or hours?

4    **A.      One week, I believe.**

5    Q.     Did you -- upon return to service, did you -- in

6    Cleveland, did you undergo any psychological testing?

7    **A.      No.**

8    Q.     Have you ever been diagnosed or told you have

9    PTSD?

10                   MR. BACEVICE:              Objection.

11                        Don't answer that.

12   BY MR. MALIK:

13   Q.     As a Cleveland Police Officer were you ever

14   asked if you had PTSD?

15                   MR. BACEVICE:              Objection.

16                        Don't answer that.

17   Q.     Do you know what PTSD is?

18                   MR. BACEVICE:              Objection, but

19                   you can answer that question.

20   **A.      Yes.**

21   Q.     And what is it?

22                   MR. BACEVICE:              Objection.

23                        Answer to the best of your ability.

24   **A.      It stands for post-traumatic stress disorder.**

25   Q.     Have you ever experienced post-traumatic stress

1  disorder?

2            MR. BACEVICE:              Objection.

3                    Don't answer that.

4  BY MR. MALIK:

5  Q.    Did you have post-traumatic stress disorder on

6  October 27th of 2012?

7            MR. BACEVICE:              Objection.

8                    Don't answer that.

9  Q.    Have you ever been diagnosed with post-traumatic

10  stress disorder --

11            MR. BACEVICE:              Objection.

12  Q.    -- on or around October 27th of 2012?

13            MR. BACEVICE:              Objection.

14                    Don't answer that.

15  Q.    When you were in Iraq were you in a -- in the

16  combat unit?

17  **A.    Yes.**

18  Q.    Was your Ranger Battalion a combat unit?

19  **A.    Yes.**

20  Q.    And did you engage in combat?

21  **A.    Yes.**

22  Q.    When you were in Afghanistan were you also in

23  the Rangers?

24  **A.    Yes.**

25  Q.    Did you -- were you in the same battalion you

1   were in in Iraq?

2   **A.      Yes.**

3   Q.      Same group of guys?  Same fellow soldiers?

4   **A.      Not the exact same, no.**

5   Q.      Did you engage in combat in Afghanistan?

6   **A.      Yes.**

7   Q.      Were you given any types of honors or medals or

8   commendations in the military?

9   **A.      Yes.**

10  Q.      Would you tell me what those are?

11  **A.      I don't recall all of them.**

12  Q.      Did any of them relate to combat duty?

13  **A.      Yes.**

14  Q.      Do you recall some of them?

15  **A.      Yes.**

16  Q.      Okay.  Can you give me an idea of what those

17  are?

18  **A.      Good Conduct Medal.  Army Achievement Medal.**

19  **Army Commendation Medal.  And other various medals that**

20  **I can't recall.**

21  Q.      When you were discharged from the military were

22  you required to be debriefed by anybody?

23  **A.      Yes.**

24  Q.      And by who?

25  **A.      Medical and psychiatric personnel on base.**

1  Q.     And which base?

2  **A.     Hunter Army Airfield.**

3  Q.     Located?

4  **A.     Savannah, Georgia.**

5  Q.     Was that the last time you would have had any

6  type of psychological evaluation prior to October 27th

7  of 2012?

8  **A.     Yes.**

9  Q.     Have you known the Cleveland Police Department

10 to psychologically evaluate any candidate for law

11 enforcement -- as a law enforcement officer?

12            MR. BACEVICE:              Objection.

13                But go ahead and answer to the best

14            of your ability.

15 **A.     Could you clarify that, please?**

16 Q.     Yeah.  Have you known any of your fellow police

17 officers to have been psychologically evaluated for

18 work as a Cleveland Police Officer?

19            MR. BACEVICE:              Same

20            objection.

21                Go ahead and answer to the best of

22            your ability.

23 **A.     I believe we all were.**

24 Q.     Okay.  And again, just so I'm clear, was that

25 solely pre-employment?

**Hoffmaster & Barberic, Inc.**
**(216) 621-2550**

Page 27

1    **A.      I believe so, yes.**

2    Q.    Have you ever applied for law enforcement in any

3    capacity and been denied?

4                MR. BACEVICE:              Objection.

5                       Go ahead.

6    **A.      No.**

7    Q.    What about secondary employment, have you ever

8    applied anywhere as a law enforcement officer in

9    security in a secondary employment capacity and been

10   denied?

11               MR. BACEVICE:            Same

12               objection.

13                      Go ahead and answer.

14   **A.      No.**

15   Q.    Have you ever worked secondary employment?

16   **A.      Yes.**

17   Q.    When you worked secondary employment as a

18   Cleveland Police Officer, did you follow all the

19   necessary rules, regulations, policies and procedures?

20               MR. BACEVICE:              Objection.

21                      Go ahead.

22   **A.      Yes.**

23   Q.    Are you under the influence of any medications

24   or drugs today that would in any way interfere with

25   your memory?

1    **A.      No.**

2    Q.      Do they have any type of mandatory drug testing

3    for the Cleveland Police Department that you're aware

4    of?

5    **A.      Upon entrance, yes.**

6    Q.      And I assume you also went through that

7    procedure?

8    **A.      Yes.**

9    Q.      Can you give me an idea of the places that

10   you've worked secondary employment as a Cleveland

11   Police Officer?

12   **A.      Various intersections around the City of**

13   **Cleveland for traffic control, and various bars in the**

14   **City of Cleveland.**

15   Q.      Have you ever lied with respect to an issue

16   involving you as a Cleveland Police Officer?

17              MR. BACEVICE:              Objection.

18                  Go ahead.

19   **A.      No.**

20   Q.      Do you know what the procedure for seeking

21   secondary employment is?

22              MR. BACEVICE:              Objection.

23                  Go ahead.

24   **A.      Yes.**

25   Q.      And have you always known that since you were a

1  Cleveland Police Officer?

2              MR. BACEVICE:              Objection.

3                  Go ahead.

4  **A.      Yes.**

5  Q.     And can you tell me today what that procedure

6  is?

7  **A.      Yes.**

8  Q.     Would you please do that?

9  **A.      You file the secondary employment paperwork, you**

10  **submit a copy of your sick time review, and you have it**

11  **signed by a supervisor with the Workmens Comp form from**

12  **the company or person employing you.**

13  Q.     Does the Cleveland Police Patrolmen's

14  Association assist officers in obtaining secondary

15  employment?

16  **A.      I believe so, yes.**

17  Q.     Have you ever gone through the union for that

18  purpose?

19  **A.      I believe so, yes.**

20  Q.     And is there a financial kickback that the union

21  gets when they provide secondary employment for an

22  officer?

23              MR. BACEVICE:              Objection to

24              the term kickback, but go ahead.

25  **A.      I don't know.**

Page 30

1  Q.    Have you ever been required to give a portion of

2  your paycheck or hourly wage back to the Cleveland

3  Police Patrolmen's Association?

4  **A.    Yes.**

5  Q.    And when you did that, did you do that in cash

6  or in check?

7  **A.    It's deducted from my city paycheck.**

8  Q.    All right.  I'm talking not your union dues, I'm

9  talking strictly for secondary employment.

10 **A.    No.**

11 Q.    What's been deducted from your city check is

12 solely for union dues.  Right?

13 **A.    Correct.**

14 Q.    But is there anything on top of union dues that

15 goes back to the Police Patrolmen's Association.

16 **A.    No.**

17 Q.    Have you ever testified in a deposition or in

18 court before?

19 **A.    Yes.**

20 Q.    And in -- with respect to depositions, how many

21 times have you testified?

22 **A.    Never.**

23 Q.    Is this the first time you've been in a

24 deposition?

25 **A.    Including from when I was in your office?**

**Hoffmaster & Barberic, Inc.**
**(216) 621-2550**

Page 31

1           MR. BACEVICE:              You mean as a

2           witness.

3           MR. MALIK:                 I mean as a

4           witness.

5           MR. BACEVICE:              You're the

6           witness right now.

7           THE WITNESS:               Okay, I

8           apologize.

9  **A.     No.**

10  Q.     So this is the first time?

11  **A.     Yes.**

12  Q.     And in court would it be a fair statement to say

13  you've testified in whatever cases you've been involved

14  in as a law enforcement officer?

15  **A.     Yes.**

16  Q.     Have you ever been trained about how to provide

17  testimony as a police officer?

18  **A.     Yes.**

19  Q.     And when was that?

20  **A.     In the academy.**

21  Q.     And was that the type of training that would

22  have been given through OPOTA?

23  **A.     Yes.**

24  Q.     Other than in the academy, have you been trained

25  to testify as a police officer?

1   **A.      No.**

2   Q.      Have you testified in court more than 25 times?

3   **A.      Yes.**

4   Q.      More than 50 times?

5   **A.      Yes.**

6   Q.      More than 75 times?

7   **A.      Yes.**

8   Q.      More than 100 times?

9   **A.      I believe so, yes.**

10  Q.      Have you ever testified in the military for any

11  reason?

12  **A.      No.**

13  Q.      Other than the Cleveland Police Academy have you

14  been to any other police academies?

15  **A.      No.**

16  Q.      Have you ever been trained in the martial arts?

17  **A.      Yes.**

18  Q.      And was that in the military?

19  **A.      Yes.**

20  Q.      What about outside of the military?

21  **A.      Yes.**

22  Q.      And do you hold any degrees in martial arts?

23  **A.      No.**

24  Q.      So you've been trained in the military.  I

25  imagine you've been trained as a police officer, too.

1   **A.      Yes.**

2   Q.      Any type of training outside of the police

3   department?

4   **A.      Yes.**

5   Q.      And can you tell me in what?

6   **A.      Boxing.**

7   Q.      Have you ever been trained in a maneuver to take

8   a person from a standing position and place them inside

9   the back seat of a police cruiser?

10  **A.      Yes.**

11  Q.      And would that have been in the academy?

12  **A.      Yes.**

13  Q.      Would that have also been in the military?

14  **A.      No.**

15  Q.      Have you been trained how to place a person in

16  the back seat of a police cruiser without causing

17  injury to that person?

18  **A.      Yes.**

19  Q.      Are you -- on October 27th of 2012, did you have

20  as your police vehicle an SUV or a four-door sedan?

21  **A.      A four-door sedan.**

22  Q.      Are you familiar with the amount of room between

23  the back of the front seat and the front of the back

24  seat?

25  **A.      Yes.**

Page 34

1    Q.    So if this is the back seat and this is -- no,

2    if this is the back of the front seat, and this is the

3    seat in the back, this space in between --

4    **A.    Is this referring to the divider cage?**

5    Q.    Yes.

6    **A.    Okay.**

7    Q.    I'm drawing on a piece of paper a straight line

8    and then a curved line representing the back seat.

9    Actually I'm going to put this as Exhibit A.  If you

10   could draw it better, feel free.

11              (Thereupon, Plaintiffs' Exhibit 1 to

12              the deposition of OFFICER AARON PETITT was

13              marked for identification.)

14   BY MR. MALIK:

15   Q.    This space here that I'm drawing by two arrows,

16   how much space is in there?

17   **A.    I couldn't give you an exact.**

18   Q.    Can you give me an approximate?

19   **A.    I believe six to eight inches.**

20   Q.    Is there enough room for a person's legs in that

21   six to eight inches?

22              MR. BACEVICE:              Objection.

23              That's pretty vague.  People are all

24              different sizes, but answer to the best of

25              your ability?

Page 35

1   **A.      Yes.**

2               MR. MALIK:                    Jack

3               anticipated my question.

4   BY MR. MALIK:

5   Q.      Is there enough room for people's legs of all

6   different sizes?

7   **A.      In my experience, yes.**

8   Q.      Would you agree with me for some people it's

9   easier to sit back there than others because some

10  people have less of a stature than others?

11  **A.      Yes, some people are smaller than others.**

12  Q.      So the smaller person would fit back there

13  better than the larger person.  Correct?

14  **A.      Correct.**

15  Q.      Since you've been 18, Officer, have you ever

16  been arrested?

17              MR. BACEVICE:                    Objection.

18                 Go ahead.

19  **A.      No.**

20  Q.      Have you ever been in the back seat of a police

21  cruiser in that six to eight inches?

22  **A.      Yes.**

23  Q.      And has that been as a police officer or for

24  some other reason?

25  **A.      As a police officer.**

1  Q.     And for a guy of your stature and height and

2  weight, would you say it was tight or not tight for you

3  to sit back there?

4  **A.     It was easy to sit back there.**

5  Q.     Okay.  You had enough leg room?

6  **A.     To get in the vehicle, yes.**

7  Q.     And when you got in the vehicle the times that

8  you were back there, did you get in under your own

9  power?

10 **A.     Yes.**

11 Q.     So you were able to place your feet where you

12 wanted them and your legs where you wanted them.

13 Correct?

14 **A.     Correct.**

15 Q.     Have you ever been tested for alcohol

16 consumption as a police officer?

17 **A.     Yes.**

18 Q.     And when was that?

19 **A.     I don't recall my last random testing.**

20 Q.     How often are the random tests?

21        MR. BACEVICE:              Random.

22 **A.     I believe they're random.**

23 Q.     Well, in a given year's period, have you had it

24 happen more than once?

25 **A.     Yes.**

1    Q.      Who gives those tests?

2    **A.      A medical facility.**

3    Q.      Part of the police department or not part of the

4    police department?

5    **A.      Not part of the police department.**

6    Q.      But at the request of the police department.

7    **A.      Yes.**

8    Q.      Have you ever smoked marijuana on or off the job

9    since becoming a police officer?

10                   MR. BACEVICE:              Objection.

11                        Go ahead and answer that.

12   **A.      No.**

13   Q.      Have you ever ingested any non over-the-counter

14   drugs since becoming a police officer?

15                   MR. BACEVICE:              Objection.

16                        Go ahead and answer.

17   **A.      Yes.**

18   Q.      And were those by prescription or

19   nonprescription?

20                   MR. BACEVICE:             Same

21              objection.

22                        Go ahead.

23   **A.      By prescription.**

24   Q.      Do you recall the police car number you were

25   driving on October 27th of 2012?

1   **A.      No, I do not.**

2   Q.      Did the car have an AVL on it?

3   **A.      I don't know.**

4   Q.      You weren't aware of any type of GPS tracking

5   device on it?

6   **A.      I don't know.**

7   Q.      Have you ever been trained to cuff a person

8   behind his or her back so as to not cause injury to

9   that person?

10  **A.      Yes.**

11  Q.      Have you ever heard the phrase come along?

12  **A.      No.**

13  Q.      Have you ever been trained to use handcuffs as

14  leverage to get a person to comply?

15  **A.      Can you define that, please?**

16  Q.      Sure.

17          Assume you have somebody that's handcuffed

18  behind their back, you placed the cuffs on them.

19          Have you been trained to use the arms in the

20  back position and the cuffs as a way to have that

21  person come along or do what you want to do, have them

22  do?

23  **A.      To escort them, yes.**

24  Q.      And have you been trained to do that without

25  injury?

1  **A.     Yes.**

2  Q.     Have you ever resided outside of Cleveland,

3  Ohio?

4  **A.     Yes.**

5  Q.     In October of 2012 did you reside outside of

6  Cleveland, Ohio?

7  **A.     No.**

8  Q.     So you were a resident of Cuyahoga County on

9  October 27, 2012?

10  **A.     Yes.**

11  Q.     And a resident of the City of Cleveland?

12  **A.     Yes.**

13  Q.     Officer, are you married?

14  **A.     No.**

15  Q.     Do you have children?

16  **A.     No.**

17  Q.     Did you graduate from high school?

18  **A.     Yes.**

19  Q.     Which high school?

20  **A.     Fairview Park.**

21  Q.     What year?

22  **A.     2003.**

23  Q.     Did you attend college?

24  **A.     Some.**

25  Q.     Did you graduate?

1    **A.      No.**

2    Q.      When you attended college, what college did you

3    attend?

4    **A.      Tri-C and University of Phoenix.**

5    Q.      Do you intend to finish your degree?

6    **A.      I hope so.  Yes.**

7    Q.      Did you declare a major?

8    **A.      Yes.**

9    Q.      And what was that?

10   **A.      Criminal justice and management.**

11   Q.      Have you gone to law school?

12   **A.      No.**

13   Q.      Have you taken any management courses in law

14   enforcement?

15   **A.      Yes.**

16   Q.      And where were those taken?

17   **A.      University of Phoenix.**

18   Q.      Was 2004 the first year you entered the

19   military?

20   **A.      No.**

21   Q.      What was the first year you entered the

22   military?

23   **A.      2002.**

24   Q.      Has any branch or unit of the military turned

25   you down for any reason?

1              MR. BACEVICE:              Objection.

2               Go ahead.

3   **A.      No.**

4   Q.     And, I'm sorry, I forgot what you told me as to

5   where you did basic training.

6   **A.      I did basic training twice.**

7   Q.     Okay.

8   **A.      At Fort Jackson, South Carolina, and Fort**

9   **Benning, Georgia.**

10   Q.     And can you explain to me why twice?

11   **A.      Fort Jackson was considered a soft skill, a**

12   **noncombat military occupation training.**

13   Q.     Is that the three-week one?

14   **A.      No, that was still a nine-week program.**

15   Q.     Okay.  And, I'm sorry, the second one?

16   **A.      Fort Benning, Georgia.**

17   Q.     That was more hard core.  Right?

18   **A.      Correct.**

19   Q.     And that's the training that you got to prepare

20   you to go overseas.  Correct?

21   **A.      That was basic training anyone receives.**

22   Q.     To qualify as a Ranger, did you have to go

23   through any specialized training?

24   **A.      Yes.**

25   Q.     And what was that training?  Can you describe

Page 42

1   it?

2   **A.      It was referred to -- it used to be called the**

3   **Ranger Indoctrination Program.  It was a series of**

4   **physical, mental evaluations and tasks.**

5   Q.      Did you go through any training that mimicked

6   you being captured as an American soldier?

7   **A.      No.**

8   Q.      With respect to your Ranger training there was a

9   firearms component to that.  Right?

10  **A.      In that course, no.**

11  Q.      Can you break the course down for me, please?

12          First let me -- let me ask you this, what period

13  of time did you undergo Ranger training?

14  **A.      That program was in 2004, I believe.**

15  Q.      For three weeks, six weeks, nine weeks?

16  **A.      Three weeks.**

17  Q.      This isn't the course where you said you didn't

18  learn anything.  Is it?

19  **A.      This is the course where -- there was no**

20  **instruction period.  It was merely testing.**

21  Q.      Okay.  Where did you learn the skills to be a

22  soldier?

23  **A.      In the military.**

24  Q.      And at what point did you learn the skills to be

25  a soldier?

Page 43

1    **A.      After I was trained.**

2    Q.      Well, and where were you trained?

3    **A.      Fort Benning, Georgia.**

4    Q.      Is Fort Benning, Georgia the only formal

5    training you had?

6            I'm not talking about on-the-job training, I'm

7    talking about formal training that you had to be a

8    Ranger.

9    **A.      Yes.**

10   Q.      Well, you shot weapons in that course.  Right?

11   **A.      Yes.**

12   Q.      In that training.

13           You learned self-defense in that course.

14   Correct?

15   **A.      Yes.**

16   Q.      You learned how to be -- not just to defend

17   yourself, but how to be an aggressor in that course.

18   Correct?

19   **A.      Yes.**

20   Q.      Did you have any skydiving or parachute training

21   in that course?

22   **A.      Not in that course.**

23   Q.      Did there come a time when you did have that

24   type of training?

25   **A.      Yes.**

1    Q.      And when was that?

2    **A.      Also 2004.**

3    Q.      And where was that?

4    **A.      Fort Benning, Georgia.**

5    Q.      What different types of weapons were you taught

6    to shoot in the military?

7    **A.      Pistols, rifles, machine guns, rocket launchers,**

8    **grenade launchers.**

9    Q.      Were you taught to use any -- strike that.

10           Were you taught or have you ever been on a

11   patrol involving having to look for or diffuse roadside

12   bombs?

13   **A.      No.**

14   Q.      What about bombs of any nature?

15   **A.      Can you clarify the question, please?**

16   Q.      Sure.

17           You went on patrol -- did you go on patrol as a

18   Ranger?

19   **A.      No.**

20   Q.      What was your primary duty as a Ranger?

21   **A.      To recapture hostages and to capture high value**

22   **targets.**

23                  THE NOTARY:              And to capture

24                  what?

25                  THE WITNESS:             High value

1           targets.
2    BY MR. MALIK:
3    Q.      And you worked in teams.  Right?
4    **A.      Yes.**
5    Q.      Did you ever work solo?
6    **A.      No.**
7    Q.      And a team is composed of how many people?
8    **A.      Between two and 16 people.**
9    Q.      And you did this type of work for what period of
10   time?
11   **A.      2004 to 2006.**
12   Q.      And you were actually in -- in the field when
13   you did this kind of work.  Correct?
14   **A.      Yes.**
15   Q.      Are you or were you in any way trained as a
16   communications specialist?
17   **A.      No.**
18   Q.      Were you in any way trained in -- to be a medic?
19   **A.      Yes.**
20   Q.      Were you trained to render first aid?
21   **A.      Yes.**
22   Q.      In your experience as a member of the military,
23   did you have to in fact render first aid to your fellow
24   soldiers in the field?
25   **A.      Yes.**

1  Q.    Were you injured in the military?

2  **A.    No.**

3  Q.    So am I correct in understanding your last tour

4  was in Afghanistan before coming back to the states?

5  **A.    Yes.**

6  Q.    And were you honorably discharged from the

7  military?

8  **A.    Yes.**

9  Q.    And what year was that?

10 **A.    2006.**

11 Q.    What was the reason that you left Triple Canopy?

12 **A.    The pay was changing and the political climate**

13 **was changing.**

14 Q.    The political climate abroad?

15 **A.    Yes.**

16 Q.    Did it become too dangerous?

17 **A.    Yes.**

18 Q.    And when you say the pay was changing, was the

19 pay going -- decreasing?

20 **A.    Yes.**

21 Q.    Why did you leave the military?

22 **A.    Because I didn't want to reenlist.**

23 Q.    And why didn't you want to reenlist?

24 **A.    I had accomplished everything I set out to do.**

25 Q.    And what was that?

1   **A.      To become a sergeant and to serve my country.**

2   Q.      Did you have any mental health concerns about

3   your well-being that formed the basis of your decision

4   to leave the military?

5                   MR. BACEVICE:           Objection.

6                       Don't answer that.

7   BY MR. MALIK:

8   Q.      So when you left the military you left as a

9   sergeant?

10  **A.      Yes.**

11  Q.      Any special type of sergeant?

12  **A.      No.**

13  Q.      Were you ever disciplined in the military?

14                  MR. BACEVICE:           Objection.

15                      Go ahead and answer.

16  **A.      No.**

17  Q.      Were you ever demoted in the military?

18                  MR. BACEVICE:           Objection.

19                      Go ahead and answer.

20  **A.      No.**

21  Q.      Were you ever investigated in the military?

22                  MR. BACEVICE:           Objection.

23                      Go ahead.

24  **A.      No.**

25  Q.      Were you ever a team leader or had a leadership

1    role of any type in the military, other than as a

2    sergeant?

3    **A.      Excuse me.**

4            **Yes.**

5    Q.    Can you tell me what that was?

6    **A.      As a corporal.**

7    Q.    As a sergeant what were your duties in the

8    military?

9    **A.      To maintain the morale and welfare of six to 12**

10   **men and to keep them mission ready.**

11   Q.    Do you feel that the United States government

12   supported you in that regard?

13   **A.      Yes, I do.**

14   Q.    Have you ever been in a military hospital for

15   yourself?

16   **A.      No.**

17   Q.    Let's come back to the United States.

18          Do you know what OPS is?

19   **A.      Yes.**

20   Q.    And what is OPS?

21   **A.      Office of Professional Standards.**

22   Q.    And what do they do?

23   **A.      They investigate complaints.**

24   Q.    Have you ever been investigated by OPS?

25          MR. BACEVICE:            Objection.

Page 49

```
1              Go ahead and answer.
2    A.    Yes.
3    Q.    On how many occasions?
4            MR. BACEVICE:           David, can I
5            just do a continuing to the OPS?
6            MR. MALIK:              Yes, sir.
7            MR. BACEVICE:           Okay.  Go
8            ahead and answer all OPS questions.
9    A.    I don't know.
10   Q.    Do you recall the incidents you've been
11   investigated for?
12   A.    Not all of them, no.
13   Q.    Can you tell me the ones you do recall?
14   A.    One issue was a male I arrested had his driver's
15   license taken.  I had to type a Form 1 in relation to
16   that investigation.
17   Q.    And why did OPS get involved?
18   A.    I believe someone used his driver's license.
19   Q.    Did you take his driver's license?
20   A.    No.
21   Q.    Did you use his driver's license?
22   A.    No.
23   Q.    And do you recall the name of this person?
24   A.    Sledge, I believe was the last name.  I don't
25   recall the first name.
```

1  Q.     Was there any allegation that you took his

2  driver's license?

3  **A.     I don't recall.**

4  Q.     Was there an allegation you used his driver's

5  license?

6  **A.     I don't recall.**

7  Q.     Did you ever use his driver's license to rent a

8  vehicle?

9  **A.     No.**

10  Q.     Was that the allegation?

11  **A.     Yes.**

12  Q.     And who made that allegation?

13  **A.     I believe Mr. Sledge did.**

14  Q.     And do you recall the outcome -- first of all,

15  did OPS complete their investigation?

16  **A.     As far as I know, yes.**

17  Q.     Do you recall the outcome of that investigation?

18  **A.     I believe the officers that were responsible for**

19  **it were disciplined.**

20  Q.     Were you disciplined as a result of that?

21  **A.     No.**

22  Q.     Do you know the officers who were disciplined?

23  **A.     No, I do not.**

24  Q.     How is it that you even got involved with

25  Mr. Sledge?

1    **A.      As a one-man officer I arrested him.  A two-man**

2    **officer conveyed him to CPU for processing.  After the**

3    **initial arrest, that's the last time I'd ever seen**

4    **Mr. Sledge.**

5    Q.    So you arrested him and passed him off to two

6    other guys?

7    **A.      Yes.**

8    Q.    And was it those two other guys that got in

9    trouble?

10    **A.      No.  I don't believe so.**

11    Q.    Okay.  But somebody within the police department

12    seemed to have used his license.  Correct?

13    **A.      Yes.**

14    Q.    Any other instance or an incident that can you

15    remember involving OPS?

16    **A.      A DUI suspect.**

17    Q.    What occurred in that case?

18    **A.      He alleged that he was removed from the vehicle**

19    **for no reason, that I arrested him, and that we**

20    **assaulted him.**

21    Q.    Did OPS thoroughly investigate that incident?

22    **A.      Yes.**

23    Q.    And do you know the outcome of that?

24    **A.      Yes.**

25    Q.    What was the outcome?

1   **A.       I was cleared.**

2   Q.      And what was that person's name?

3   **A.       Charles Horton, I believe.**

4   Q.      Do you know what other incidents involving OPS

5   you were involved in?

6   **A.       I don't recall.**

7   Q.      What is internal -- what is IA?

8   **A.       Internal affairs.**

9   Q.      Have you ever been investigated by internal

10  affairs?

11  **A.       Yes.**

12                  MR. BACEVICE:            David, can I

13                  have a standing objection to the internal

14                  affairs questions?

15                  MR. MALIK:               Sure.

16                  MR. BACEVICE:            Okay.  Go

17                  ahead.

18  BY MR. MALIK:

19  Q.      And for what?

20  **A.       I believe the same incidents.**

21  Q.      Do you know total how many times you've been

22  investigated by either OPS or internal affairs?

23  **A.       No, I don't.**

24  Q.      Do you know what the integrity section of the

25  Cleveland Police Department is?

1   **A.      Not exactly, no.**

2   Q.      Do you know if it's part of internal affairs or

3   OPS?

4   **A.      I don't know.**

5   Q.      Did you stop Reginald Folks on October 27th of

6   2012?

7   **A.      Yes.**

8   Q.      Where did you stop Reginald Folks?

9   **A.      In the City of Cleveland.**

10  Q.      And what location specifically?

11  **A.      On Chester Avenue.**

12  Q.      And what would the cross street be?

13  **A.      I don't recall.**

14  Q.      Do you recall immediately prior to stopping him

15  where you were located in relationship to his vehicle?

16  **A.      Yes.**

17  Q.      Where were you?

18  **A.      To the rear and to the left.**

19  Q.      And you were on, I'm sorry, what road?

20  **A.      Chester.**

21  Q.      And what direction were you headed?

22  **A.      Eastbound.**

23  Q.      And heading eastbound in October of 2012, how

24  many lanes were there on the eastbound side of Chester?

25  **A.      Two, I believe.**

Page 54

1    Q.      So you would be to his left closest to the

2    median?

3    **A.      Yes.**

4    Q.      And when you stopped him -- or excuse me.

5            When you first saw Mr. Folks, where were you

6    located?

7    **A.      Behind his vehicle.**

8    Q.      But where were you located on Chester in terms

9    of cross streets?

10   **A.      I believe in the area of 70th.**

11   Q.      And did you follow him?

12   **A.      Yes.**

13   Q.      And why did you follow him?

14   **A.      I ran the license plate and it came back to a**

15   **suspended driver.**

16   Q.      Tell me the procedure that you used for running

17   the license plate.

18   **A.      You enter the license plate into the mobile data**

19   **terminal in the vehicle.**

20   Q.      And you say it came back suspended.

21   **A.      Yes.**

22   Q.      When you're looking at the mobile data terminal,

23   where would it say on the terminal that his license is

24   suspended?

25   **A.      Under his driver information.**

Page 55

1  Q.    Do you get a printout?

2  **A.    No.**

3  Q.    What caused you to run his license plate?

4  **A.    The vehicle was in front of me.**

5  Q.    Do you need as a police officer to have probable

6  cause to run a license plate?

7  **A.    No.**

8  Q.    Is there anything illegal that Mr. Folks was

9  doing in your opinion that caused you to run his

10  license plate?

11  **A.    No.**

12  Q.    And what time of the day or evening was this?

13  **A.    I don't recall exactly.**

14  Q.    So basically you as a police officer in your

15  opinion have the right to drive around the City of

16  Cleveland running the license plates of people without

17  any type of probable cause?

18          MR. BACEVICE:              Objection.

19              Go ahead and answer.

20  **A.    Yes.**

21  Q.    Now, can you describe the vehicle you were

22  driving?

23  **A.    A black and white Crown Victoria four-door**

24  **sedan.**

25  Q.    By the way, have you ever run the license plate

1    of an individual where the mobile data terminal

2    information indicated a license was suspended and it

3    was an error?

4    **A.      Not that I know of, no.**

5    Q.      So do you have to punch in a code to use the

6    MDT?

7    **A.      No.**

8    Q.      Do you have to punch in any type of identifier

9    to use the MDT?

10   **A.      Not once you're logged into the program.**

11   Q.      So when do you initially log into the program?

12   **A.      Generally beginning of the shift.**

13   Q.      And do you log numbers or names or letters or

14   combinations of those?

15   **A.      Combinations of those.**

16   Q.      Is it numbers and letters?

17   **A.      Yes.**

18   Q.      And does each officer have his own number and

19   letter, or does each MDT have its own number and letter

20   code?

21   **A.      Each officer has their own.**

22   Q.      When did you -- where were you located when you

23   first realized that in your version of the events that

24   Mr. Folks had a suspended license?

25   **A.      After I ran the license plate.**

1  Q.     And at what street on Chester, what cross street

2  were you at when you ran the license?

3  **A.     I don't recall exactly.**

4  Q.     Well, do you know approximately?

5  **A.     In the area of 70th.**

6  Q.     Okay.  So you got to a traffic light eventually.

7  Correct?

8  **A.     Correct.**

9  Q.     And where was that traffic light located?

10 **A.     I don't recall exactly.**

11 Q.     You did not stop his vehicle until after that

12 traffic light turned green.  Correct?

13 **A.     Correct.**

14 Q.     And why was that?

15 **A.     I verified that he was the driver of the**

16 **vehicle, and then after the driver -- after the light**

17 **turned green, so he wouldn't be stuck in the middle of**

18 **the intersection, I pulled him over.**

19 Q.     How did you verify that he was the driver of the

20 vehicle?

21 **A.     The mobile data terminal shows you a picture of**

22 **the person driving -- or of the owner of the vehicle.**

23 Q.     So the MDT showed you a picture of Mr. Folks?

24 **A.     Yes.**

25 Q.     And when you were at the light is it your

1  testimony that you could actually see Mr. Folks through

2  his window?

3  **A.      Yes.**

4  Q.      And could you see Mr. Folks through the back

5  window when you were on 70th?

6  **A.      No.**

7  Q.      When was the first time you were able to see

8  Mr. Folks?

9  **A.      When I pulled next to the vehicle.**

10  Q.      And by that time you had already run his

11  license?

12  **A.      Yes.**

13  Q.      Where were you coming from?

14  **A.      General patrol of the area.**

15  Q.      And when you do a general patrol of the area,

16  does that area have a district name or number?

17  **A.      Third District.**

18  Q.      And what does general patrol include?

19  **A.      Includes traffic enforcement, answering radio**

20  **broadcasts, and on-view assignments which would be just**

21  **anything that we see.**

22  Q.      So if somebody has a house on 75th -- strike

23  that.

24          What was the mechanism you used to pull

25  Mr. Folks over?

Page 59

1    **A.      My overhead lights and sirens.**

2    Q.     And did you get on your PA at all and say pull

3    over?

4    **A.      No.**

5    Q.     And when you put your overhead lights and sirens

6    on, did Mr. Folks immediately pull over?

7    **A.      Yes, he did.**

8    Q.     And where did you park in relation to Mr. Folks?

9    **A.      To the rear of him.**

10   Q.     Did you park directly behind him, or did you

11   park at an angle?

12   **A.      I don't recall.**

13   Q.     Generally what's your -- your habit?

14   **A.      Directly behind the vehicle.**

15   Q.     At that point did you call any other officers?

16   **A.      Not at that point, no.**

17   Q.     So you pull Mr. Folks over, you have your lights

18   on and your siren is on?

19   **A.      Yes.**

20   Q.     Now, when you used your siren, did you use it

21   for a couple of whelps to let him know you wanted to

22   pull him over and then turn it off, or did you keep it

23   continuously on when you approached his vehicle?

24   **A.      I don't recall.**

25   Q.     And then did you approach his vehicle?

1    **A.      Yes.**

2    Q.     What type of -- what's the sound that that siren

3    on that vehicle makes?

4    **A.      Could you clarify that, please?**

5    Q.     Sure.

6           Is it a traditional police siren or is it more

7    of a high tech siren?

8    **A.      I believe it's just a standard police siren.**

9              MR. BACEVICE:            David, can we

10             go back for a second?

11                When you were asking questions about

12             approach, I was unclear if you were saying

13             while he approached him still in the zone

14             car as in driving behind him or got out of

15             the car and walked towards it.

16   BY MR. MALIK:

17   Q.     So what -- what year was your vehicle?  Do you

18   know?

19   **A.      I don't know.**

20             THE WITNESS:             I'm sorry, but

21             could we take a quick break, hit the

22             restroom real quick?

23             MR. MALIK:               Sure.

24             THE VIDEOGRAPHER:        Off the

25             record.

Page 61

1           (Thereupon, there was a brief

2           recess.)

3           THE VIDEOGRAPHER:          On the record.

4    BY MR. MALIK:

5    Q.    Can you tell me how -- can you describe how the

6    area was lit when you ran the license plate and stopped

7    Mr. Folks?

8    **A.    Well lit during daylight hours.**

9    Q.    Was this a daylight stop?

10   **A.    Yes.**

11   Q.    And do you know what time it was?

12   **A.    Not exactly, no.**

13   **           (Thereupon, Plaintiffs' Exhibit 2 to**

14   **           the deposition of OFFICER AARON PETITT was**

15   **           marked for identification.)**

16   Q.    Handing you Exhibit 2, it's a Xerox copy, but

17   can you identify what that is?

18   **A.    This is a copy of the UTT that I issued to**

19   **Mr. Folks.**

20   Q.    And does it indicate the time that you issued

21   it?

22   **A.    Yes, it does.**

23   Q.    And what time does it say?

24   **A.    10:31 a.m.  10:21, I can't exactly be sure.**

25   Q.    But it was in the morning.

Page 62

1   **A.      Yes.**

2   Q.      Do you recall the weather that day?

3   **A.      I do not believe there was any adverse weather.**

4   Q.      Mr. Folks was not speeding.  Correct?

5   **A.      Correct.**

6   Q.      Mr. Folks appropriately stopped at the red

7   light.  Correct?

8   **A.      Correct.**

9   Q.      Does that area of Cleveland have a neighborhood

10  name?

11  **A.      I don't know.**

12  Q.      On Chester -- excuse me, can you look at the

13  ticket and tell me where it indicates you stopped him?

14  **A.      East 79th and Chester, I believe.**

15  Q.      All right.  Does that area of Cleveland between

16  70th and 79th have a name, a neighborhood name?

17  **A.      I don't know.**

18  Q.      Have you patrolled that -- had you patrolled

19  that neighborhood prior to October 27th of 2012?

20  **A.      Yes.**

21  Q.      Was that part of your regular patrol?

22  **A.      Yes.**

23  Q.      And when you patrol Chester during your regular

24  patrol, what are you looking for?  If anything.

25  **A.      Anything that could require police assistance or**

Page 63

1   **require police intervention.**

2   Q.      Have you -- have you given tickets for driving

3   under suspension prior to October 27th of 2012?

4   **A.      Yes.**

5   Q.      And in every one of those instances had you gone

6   to court?

7   **A.      No.**

8   Q.      Why would you go to court sometimes and not go

9   to court other times?

10  **A.      If I was subpoenaed for court, I would go.**

11  Q.      Do you not keep your own docket of court dates

12  for tickets that you issue?

13  **A.      No.**

14  Q.      Whose responsibility is it to subpoena you?

15  **A.      I believe the prosecutor's.**

16  Q.      Is it your testimony that you did not get

17  subpoenaed twice for Mr. Folks' court date?

18  **A.      Yes.**

19  Q.      When you go to court for driving under

20  suspension, do you give testimony if the suspension is

21  contested?

22  **A.      If need be, yes.**

23  Q.      And have you given testimony before in cases of

24  driving under suspension?

25  **A.      I don't recall exact cases.**

Page 64

1    Q.    Have you ever testified in a driving under
2    suspension case before?
3    **A.    Yes.**
4    Q.    Before October 27th of 2012.
5    **A.    I believe so, yes.**
6    Q.    And what information do you have to provide
7    during the testimony?
8    **A.    I describe to the prosecutor or the court**
9    **personnel what had occurred and the information in**
10   **regards to the citation.**
11   Q.    Do you have to provide a copy of the MDT
12   information in support of your ticket?
13   **A.    No.**
14   Q.    So the prosecutor just takes your word for it?
15            MR. BACEVICE:            Objection.
16                Go ahead.
17   **A.    Sometimes there is a LEADS printout in the case**
18   **file.**
19   Q.    And what -- what would cause a LEADS printout to
20   be generated?
21   **A.    I believe the prosecutor would print it out.**
22   Q.    And would the LEADS printout be shown to defense
23   counsel?
24            MR. BACEVICE:            Objection.
25                Answer, if you know.

1  **A.      I don't know.**

2  Q.      And what information does the LEADS printout

3  have?

4  **A.      It would show driver's information, prior**

5  **convictions and suspensions.**

6  Q.      And is the LEADS printout an accurate facsimile

7  of what shows up on the MDT?

8  **A.      Yes.**

9  Q.      So it would be your testimony that had a LEADS

10  printout been printed in this case, Mr. Folks -- it

11  would have demonstrated a suspended license on

12  Mr. Folks?

13  **A.      Yes.**

14  Q.      Now, if we were to go back and get a LEADS

15  printout for Mr. Folks today, would it still show a

16  suspended license --

17                  MR. BACEVICE:                  Objection.

18                      Answer if you know.

19  BY MR. MALIK:

20  Q.      -- as you are claiming?

21  **A.      Only if he was still suspended.**

22  Q.      But if there had been a suspension but the

23  suspension was cleared up, would it show back to

24  October of 2012 that his license had been suspended?

25                  MR. BACEVICE:                  Same

```
 1              objection.

 2                   Go ahead.

 3  A.      I don't know.

 4  Q.      So is there or isn't there a historical nature

 5  to the LEADS printout?

 6              MR. BACEVICE:              Same

 7              objection.

 8                   Go ahead and answer.

 9  A.      Yes.

10  Q.      So the LEADS printout would be a relevant piece

11  of information to determine if a person's license was

12  suspended.

13              MR. BACEVICE:              Same

14              objection.

15                   Go ahead.

16  A.      Yes.

17  Q.      So when you got out of your vehicle, did you get

18  out of the driver's side of your vehicle?

19  A.      Yes.

20  Q.      And did you approach Mr. Folks' vehicle?

21  A.      Yes.

22  Q.      Can you describe to us, so we can get it on the

23  record, what you did.

24  A.      After exiting my vehicle?

25  Q.      Correct.
```

1  A.      I approached the driver's side of the vehicle.

2  I advised the driver why I was stopping him, asked him

3  for his driver's license and proof of insurance.

4  Q.      Let me stop you right there.

5          When you approached his vehicle, was his -- this

6  is October 27th, do you recall whether it was cold out?

7  A.      I don't recall.

8  Q.      Was his window up or down?

9  A.      I don't recall.

10  Q.      But you engaged in a conversation with him.

11  Correct?

12  A.      Yes.

13  Q.      Was it through the window?

14  A.      No.

15  Q.      Okay.  Tell me what happened in your version.

16  A.      When I approached the vehicle, I believe the

17  window was already down.  I informed Mr. Folks of why I

18  had stopped him.  I requested his driver's license and

19  proof of insurance, informed him that he was suspended.

20  I believe he told me that he was not.  And I told him

21  to sit tight in the vehicle and that I'd verify it on

22  my computer.

23  Q.      And then what did you do?

24  A.      I returned to my zone car to make sure that the

25  person driving they ID'd was the owner of the vehicle,

1  **Mr. Folks.**

2        **I verified that it was him and then I wrote this**

3  **citation, referring to the copy of the one that you**

4  **gave me.**

5  Q.     Which is exhibit?

6  **A.     Exhibit 2.**

7  Q.     2.

8        Once you had the information on the mobile data

9  terminal, did you leave it on the terminal or did you

10  punch a button and it went away?

11  **A.     I left it on the terminal.**

12  Q.     So that when you went back to your car the same

13  information that you had initially was on the terminal?

14  **A.     Yes.**

15  Q.     So is it your testimony that you verified the

16  fact that his license was suspended the second time?

17  **A.     Yes.**

18  Q.     So did you actually go inside your vehicle?

19  **A.     Yes.**

20  Q.     There came a time when you got out of your

21  vehicle.  Right?

22  **A.     Yes.**

23  Q.     You walked back up to see Mr. Folks.  Correct?

24  **A.     Yes.**

25  Q.     And what occurred at that point?

**Hoffmaster & Barberic, Inc.**
**(216) 621-2550**

Page 69

1    **A.      At that point I had brought a citation up to**

2    **Mr. Folks.  Again, referring to Exhibit 2.  And advised**

3    **him that he was suspended and that I was issuing him a**

4    **court date, which I had wrote on the bottom of the**

5    **ticket, and that he needed to sign it, and that it was**

6    **not an admission of guilt, simply saying he was**

7    **receiving a copy of the citation and that he needed to**

8    **appear in court.**

9    Q.    And then what occurred?

10   **A.      Mr. Folks stated he was not going to sign the**

11   **citation, that he was not suspended, and he would not**

12   **sign it.**

13   Q.    Did he give you a reason he wasn't going to sign

14   it?

15   **A.      Because he stated he was not suspended.**

16   Q.    Okay.  Then what did you do?

17   **A.      I explained to him again that signing it was not**

18   **an admission of guilt, that I verified it on my**

19   **computer and that he was listed as having a suspended**

20   **driver's license.**

21   Q.    Okay.  And then what occurred?

22   **A.      I advised him several more times to sign, that**

23   **he needed to sign the citation or he would be subject**

24   **to arrest for refusing to sign.**

25   Q.    And during the time you're talking to him about,

1  you're advising him that he needs to sign the citation,

2  how is your demeanor?

3  **A.     Average, simply explaining to him the parameters**

4  **of the citation.**

5  Q.    So then what occurred?

6  **A.     He stated that he would not sign the citation.**

7  **I advised him to step out of the vehicle.  He stated he**

8  **would not step out of the vehicle.  I then radioed for**

9  **another car.**

10  Q.    In your opinion is it against the law to not

11  sign a citation?

12              MR. BACEVICE:              Objection.

13                   Answer to the best of your ability.

14  **A.     Yes.**

15  Q.    And why did you advise Mr. Folks to step out of

16  the car?

17  **A.     At this point I was going to place him under**

18  **arrest for driving under suspension and refusing to**

19  **sign the citation.**

20  Q.    Were you going to suspend him for driving under

21  suspension if he had signed the citation?

22              MR. BACEVICE:              Suspend him

23                   for driving under suspension?

24  BY MR. MALIK:

25  Q.    Were you going -- strike that.

Page 71

1      Were you going to arrest him for driving under
2  suspension had he signed the citation?
3  **A.      No.**
4  Q.     What is the act that gave rise to your decision
5  to arrest him?
6  **A.      That he stated he was going to refuse to sign**
7  **it.**
8  Q.     Okay.  Did you tell him you were going to arrest
9  him?
10 **A.      Yes.**
11 Q.     Did you tell him you were going to arrest him
12 unless he signed the citation?
13 **A.      I advised him that if he did refuse to sign it**
14 **he would be placed under arrest.**
15 Q.     And did he say anything to you?
16 **A.      He stated that he would not sign it.**
17 Q.     You were at his deposition.  Correct?
18 **A.      Yes.**
19 Q.     And you were there in your uniform.  Correct?
20 **A.      Yes.**
21 Q.     And you had your badge and your gun with you
22 just like you have today.  Correct?
23 **A.      Correct.**
24 Q.     Is this the outfit that you had on the evening
25 when he was arrested?

Page 72

1          MR. BACEVICE:              Morning.

2   BY MR. MALIK:

3   Q.     On the morning.  Excuse me.

4   **A.     No.**

5   Q.     Can you describe how you were dressed on that

6   morning?

7   **A.     I would have had my ballistic vest on, my duty**

8   **belt which would have contained my firearm, my asp**

9   **baton, my taser, pepper spray, handcuffs.**

10  Q.     Okay.  Now, those -- would those things have

11  been visible to Mr. Folks?

12             MR. BACEVICE:              Objection.

13                  Answer if you know.

14  **A.     I believe he could have seen them, yes.**

15  Q.     Well, how close in proximity to him were you

16  when you were talking to him through the window?

17  **A.     Standing right next to the window.**

18  Q.     So you -- at his deposition you heard his

19  version of the events.  Correct?

20  **A.     Yes.**

21  Q.     And his version of the events differ than your

22  version.  Correct?

23  **A.     Correct.**

24  Q.     In what ways do you believe his version of the

25  events differ than your version?

1  **A.      That the information I'm providing you is**

2  **accurate.**

3  Q.      Well, he indicated you jerked him out of the

4  car.  Correct?

5  **A.      Correct.**

6  Q.      Did you?

7  **A.      No.**

8  Q.      Did there come a time when he got out of the

9  car?

10  **A.      Yes.**

11  Q.      And how did he get out of the car?

12  **A.      I -- as he stated, he was going to exit the**

13  **vehicle.  I opened up his driver's side door and**

14  **advised him to step out of the vehicle and immediately**

15  **place his hands on top of his vehicle.**

16  Q.      And did he do that?

17  **A.      Yes, he did.**

18  Q.      And when he did that, what did you do next?

19  **A.      I advised him to step sideways to the side of**

20  **the vehicle, around to the back of his vehicle, keeping**

21  **his hands in the air; where I had one hand on the side**

22  **of his hip, on the left side of his hip where I guided**

23  **him to the rear of his vehicle.**

24  Q.      And did he comply with you doing that?

25  **A.      Initially he stated he wouldn't, and then he**

1   **chose to.**

2   Q.      And then where did you guide him to?

3   **A.      To the rear of his vehicle.**

4   Q.      At the point you guided him to the rear of his

5   vehicle, was he handcuffed?

6   **A.      No, not at this point.**

7   Q.      And then what did you do?

8   **A.      I advised him to bring his left hand back behind**

9   **his back, which he did.  And then I advised him to**

10  **bring his other hand back behind his back and put his**

11  **palms together like he was praying.**

12  Q.      And did he do that?

13  **A.      After being told several more times to bring his**

14  **right hand behind his back, yes, he did.**

15  Q.      Now, had anybody else arrived in terms of backup

16  in the area for you at that point?

17  **A.      I believe the other vehicle was pulling up as I**

18  **was placing Mr. Folks into handcuffs.**

19  Q.      So when he had his hands behind his back, is

20  that the point where you put the handcuffs on?

21  **A.      Yes.**

22  Q.      And then what did you do?

23  **A.      I patted him down, and then he was escorted to**

24  **the zone car.**

25  Q.      Whose zone car was he escorted to?

Page 75

1    **A.    Mine.**

2    Q.    And was he put in your back seat?

3    **A.    Yes.**

4    Q.    And did you take him to -- did you eventually

5    take him somewhere?

6    **A.    Yes.**

7    Q.    Where did you take him?

8    **A.    To the Justice Center, the Central Processing**

9    **Unit.**

10   Q.    Now, describe what you did in order to get

11   Mr. Folks into the back seat of your vehicle.

12   **A.    When we initially went to the back of the**

13   **vehicle, I opened up the car and advised him to face**

14   **me, sit down like he's sitting on a couch and scoot**

15   **backwards.**

16   **    He stated that there wasn't enough room in the**

17   **vehicle, and I assured him that bigger people than him**

18   **have been in the back seat of the vehicle and that he**

19   **needed to get in the vehicle.**

20   Q.    And then what occurred?

21   **A.    He was advised several more times to get into**

22   **the vehicle.  He began screaming that he could not fit,**

23   **and then he put one foot inside of the vehicle.**

24   Q.    Did he indicate to you that he had any injuries

25   or any medical conditions that would prevent him from

Page 76

1    being in the back of your vehicle?

2    **A.      No.**

3    Q.      Had he done that, what would have occurred?

4    **A.      I would have asked him what medical conditions**

5    **he has that make it unable for him to sit the same way**

6    **in the back of my car that he was sitting in his**

7    **vehicle.**

8    Q.      So did you put him in the vehicle entirely by

9    yourself?

10   **A.      No.  He got in on his own power.**

11   Q.      Okay.  And then what did you do?

12   **A.      I closed the door.**

13   Q.      And then what did you do?

14   **A.      I conferred with the supervisor on scene.**

15   Q.      And who was that, Sergeant Bickerstaff?

16   **A.      Yes.**

17   Q.      And he had shown up at the scene?

18   **A.      Yes.**

19   Q.      Who else had shown up at the scene?

20   **A.      Officer Hartman, and another officer who I don't**

21   **recall his name.**

22   Q.      And what part of, if any, of putting Mr. Folks

23   in the back seat would any of the other officers have

24   seen?

25   **A.      I believe Officer Hartman and the other officer**

1  **were there while he was being ordered in the back of**

2  **the vehicle.**

3  Q.     So is what you've just testified to the entire

4  truth of what happened?

5  **A.     Yes.**

6  Q.     Were you worried about, in the performance of

7  your duties, about being in that area for any other

8  reason of 79th and Chester?

9  **A.     I'm sorry, could you clarify the question?**

10  Q.     Sure.

11        Did you feel threatened in any regard about

12  being on 79th and Chester?

13  **A.     No.**

14  Q.     Do you know that to be a high crime area?

15  **A.     I'm not familiar with that area.**

16  Q.     The way that you are claiming you handled the

17  arrest, is that consistent with the procedure you were

18  taught on how to make an arrest in that type of

19  situation?

20              MR. BACEVICE:              Objection.

21                 Go ahead and answer.

22  **A.     Yes.**

23  Q.     And that's the way you've been taught at the

24  police academy?

25              MR. BACEVICE:              Objection.

1            Go ahead.

2    **A.     Yes.**

3    Q.     When you radioed for backup, did you use your

4    car radio or did you use your -- any other radio?

5    **A.     I used my portable radio.**

6    Q.     And that would have been clipped to your jacket

7    or whatever?

8            MR. BACEVICE:            Lapel.

9    **A.     It would have been clipped to the left side of**

10   **the lapel on my vest.**

11   Q.     Okay.  Was the Third District the district you

12   were assigned to on October 27th of 2012?

13   **A.     Yes.**

14   Q.     About how long had you been on your shift at the

15   time you encountered Mr. Folks?

16           This is about 10:21, I think you said.

17   **A.     Approximately three to four hours.**

18   Q.     And when would your shift have started?

19   **A.     I believe it's 6:30 a.m.**

20   Q.     And when would your shift have ended?

21   **A.     2:30 or 14:30 p.m., 2:30 p.m.**

22   Q.     And do you have a duty roster for that day?

23   **A.     Yes.**

24   Q.     And when you have a duty roster and fill it out,

25   do you have to put in there when you make traffic

Page 79

1   stops?

2   **A.      I do.**

3   Q.      And did you record that traffic stop on your

4   duty roster?

5   **A.      Yes.**

6   Q.      And would that -- would that duty roster also

7   indicate what you had done prior in the day?

8   **A.      Yes.**

9   Q.      Did you know Mr. Folks prior to October 27th of

10  2012?

11  **A.      No.**

12  Q.      Have you ever lost your temper making an arrest?

13                 MR. BACEVICE:                  Objection.

14                       Go ahead and answer.

15  **A.      No.**

16  Q.      Tell me the procedure once you have a ticket,

17  what you have to do with it, that you've issued, what

18  you have to do with it when you get back to the

19  district.

20  **A.      We turn it in.**

21  Q.      And who do you turn it into?

22  **A.      Generally it goes into a ticket box or a ticket**

23  **drawer.**

24  Q.      Did you advise radio dispatch at all that

25  Mr. Folks had had a suspended license?

1    **A.    I don't recall.**

2    Q.    Do you have to advise radio dispatch the reason

3    for a stop?

4    **A.    No.**

5              MR. BACEVICE:            It's okay.

6                  Objection noted for the record,

7              answer's fine.

8    BY MR. MALIK:

9    Q.    It's not part of the rules, regulations,

10   policies or procedures to notify dispatch of the reason

11   for a stop?

12             MR. BACEVICE:          Objection.

13                 Go ahead.

14   **A.    No.**

15   Q.    What do the rules, regulations, policies and

16   procedures call for with respect to any notification to

17   anybody in the police department regarding a traffic

18   stop?

19             MR. BACEVICE:          Objection.

20                 Can I have a standing for the rules,

21             policies and procedures, David?

22             MR. MALIK:             M-hm.

23             MR. BACEVICE:          Go ahead and

24             answer.

25   **A.    I don't know.**

Page 81

1   Q.      Did you know in October of 2012?

2   **A.      I don't know exactly what they say.**

3   Q.      Did you in 2012?

4   **A.      No.**

5   Q.      Do you recall your vehicle number?

6   **A.      If I reference Exhibit 2, the citation?**

7   Q.      M-hm.

8   **A.      Charlie 14.**

9   Q.      And when you get vehicles assigned to you for

10  duty, are they randomly assigned, or do you have the

11  same vehicle on a regular basis?

12  **A.      Every district's a little bit different, but I**

13  **believe it's usually random.**

14  Q.      What does CPU stand for?

15  **A.      Central Processing Unit.**

16  Q.      And is that the jail?

17  **A.      Yes.**

18  Q.      When you took Mr. Folks to jail, were you

19  followed by any other vehicle?

20  **A.      Yes.**

21  Q.      Who followed you?

22  **A.      Officer Hartman and the other officer.**

23  Q.      Did you have any conversation with Mr. Folks on

24  the way to jail?

25  **A.      Not that I recall.**

1  Q.     Other than what you've told me today did you

2  acquire any other information from Mr. Folks during

3  your encounter with him?

4  **A.     No.**

5  Q.     Are you able to tell me what the correct police

6  procedure was in October of 2012 for a Cleveland Police

7  Officer who approaches a vehicle whose driver is

8  believed to be driving under suspension?

9            MR. BACEVICE:            Objection.

10            Go ahead.

11  **A.     Not verbatim, no.**

12  Q.     Well, is the procedure the procedure as you

13  executed, as you claim you executed it?

14            MR. BACEVICE:            Same

15            objection.

16            Go ahead.

17  **A.     I believe so, yes.**

18  Q.     Other than the ticket did you file any kind of a

19  police report related to Mr. Folks?

20  **A.     No.**

21  Q.     Was the ticket a waivable offense?

22  **A.     No.**

23  Q.     So you have officer discretion to issue a ticket

24  or not issue a ticket.  Correct?

25  **A.     Correct.**

Page 83

1    Q.     And when I use the phrase -- when using the

2    phrase officer discretion, what does it mean to you?

3    **A.     It means that based on the totality of**

4    **circumstances on whether or not the person is issued a**

5    **citation or not.**

6    Q.     But it gives you the ability to choose who to

7    and who not to issue a citation to.  Correct?

8              MR. BACEVICE:                Objection.

9                Go ahead.

10   **A.     Yes.**

11   Q.     So would it be a fair statement to say then in

12   -- there have been times in other driving under

13   suspension stops where you have not issued a ticket to

14   an individual?

15   **A.     No.**

16   Q.     Is it your testimony that you've issued a ticket

17   a hundred percent of the time to every person you

18   stopped that you believed was driving under suspension?

19   **A.     I believe so, yes.**

20   Q.     Did you ask Mr. Folks where he was going?

21   **A.     I don't recall.**

22   Q.     Did you ask him where he was employed?

23   **A.     I don't recall.**

24   Q.     If you were not to issue a ticket for somebody

25   that you believe was driving under suspension, is there

1    any consequences to you for not issuing the ticket?

2              MR. BACEVICE:              Objection.

3                    Go ahead.

4    A.      I believe so, yes.

5    Q.      What do you think those consequences would be?

6              MR. BACEVICE:              Same

7              objection.

8                    Go ahead.

9    A.      I don't recall.

10   Q.      But you don't know.  Right?  Or you do know.

11             MR. BACEVICE:              Same

12             objection.

13   A.      I don't --

14             MR. BACEVICE:              Go ahead.

15   A.      I do not know the consequences.

16   Q.      Has there ever been a time when you've stopped a

17   person that's been African-American where you haven't

18   issued them some type of citation?

19   A.      Yes.

20   Q.      And in what instances did that occur?

21   A.      On a regular basis.

22   Q.      Okay.  Like give me an example.

23   A.      Two days ago during work I stopped a driver who

24   I did not issue a citation for for the moving

25   violation.

Page 85

1  Q.    And what was the reason?

2              MR. BACEVICE:            Reason for the

3              stop, or reason for not issuing?

4              MR. MALIK:            The reason for

5              not issuing.

6              MR. BACEVICE:            Go ahead.

7  **A.    He was very polite, he was very courteous.  I**

8  **asked him if he knew that he committed the violation.**

9  **He stated that he did and that he apologized for it.**

10  **    I verified that he was a valid driver.  I**

11  **thanked him for his cooperation and I sent him on his**

12  **way.**

13  Q.    Can you think of any other instances when that's

14  occurred to African-Americans?

15      Was that person African-American?

16  **A.    Yes, he was.**

17  Q.    Can you think of any other instances?

18  **A.    On a regular basis, on almost any given day that**

19  **I'm conducting traffic duties, I let people go on a**

20  **regular basis, and my duties would reflect that.**

21  Q.    Do you still record the stop on your duty

22  report?

23  **A.    Yes, I do.**

24  Q.    So do you have duty reports that indicate you

25  stopped somebody but issued no citation?

1   **A.      Yes, I do.**

2   Q.      So the one from a couple days ago should

3   indicate that.  Correct?

4   **A.      Yes, it would.**

5   Q.      And when you put the information down for the

6   duty report, do you -- what information about the

7   person that you stopped do you list?

8   **A.      I list the license plate, the license plate**

9   **number, and under the section where you would put the**

10  **information of what occurred, I list whether or not a**

11  **citation was issued and the person's last name and the**

12  **number of citations, or advised and W slash S or W and**

13  **S standing for warned and sent, and the person's last**

14  **name.**

15  Q.      Did you use any force upon Mr. Folks that would

16  cause injury?

17  **A.      No.**

18  Q.      Did you cause any injury to Mr. Folks?

19  **A.      No.**

20  Q.      Did Mr. Folks tell you you caused injury to him?

21  **A.      Not that I recall.**

22  Q.      Did you -- Mr. Folks claims there was a problem

23  putting him in the back seat.  Correct?

24  **A.      Yes.**

25  Q.      Do you agree or disagree with that?

Page 87

1   **A.      I agree.**

2   Q.      You agree there was a problem putting him in the

3   back seat?

4   **A.      Yes.  He refused numerous times to get in the**

5   **vehicle at first.**

6   Q.      Okay.  And was there any force used to get him

7   in the vehicle?

8   **A.      No.**

9   Q.      Mr. Folks has indicated that he suffered

10  injuries from the arrest.  Are you aware of that?

11  **A.      Yes.**

12  Q.      And do you agree with that?

13  **A.      No.**

14  Q.      You were able to listen to Mr. Folks' testimony.

15  Correct?

16  **A.      Yes.**

17  Q.      And the way he described the accident, can you

18  tell me whether or not had the arrest gone down the way

19  he says it went down that the force used would have

20  been unreasonable?

21              MR. BACEVICE:              Objection.

22                  Answer to the best of your ability.

23  **A.      I'm sorry, an accident or?**

24  Q.      You understand -- you heard Mr. Folks' testimony

25  about force being used.  Correct?

**Hoffmaster & Barberic, Inc.**
**(216) 621-2550**

Page 88

1   **A.      Yes.**

2   Q.     What I'm asking you is, accepting what he says

3   as true, is it your opinion that the force used would

4   have been reasonable?

5               MR. BACEVICE:          Objection.

6                    Again, answer to the best of your

7                    ability.

8   **A.      I don't know.**

9               MR. MALIK:             Let's take a

10                   break.

11              MR. BACEVICE:          Sure.

12              THE VIDEOGRAPHER:      Off the

13                   record.

14                   (Thereupon, there was a brief

15                   recess.)

16              THE VIDEOGRAPHER:      On the record.

17  BY MR. MALIK:

18  Q.     Would you consider force to be unreasonable to

19  have injured a person who wasn't resisting?

20              MR. BACEVICE:          Objection,

21                   incomplete hypothetical.

22  Q.     During an arrest?

23              MR. BACEVICE:          Same

24                   objection.

25                   Answer to the best of your ability.

Page 89

1    **A.       Can you rephrase that?**

2              MR. MALIK:                Sure.  Janet?

3              THE NOTARY:               Question:

4               "Would you consider a stop to be

5               unreasonable to have injured a person who

6               wasn't resisting?"

7    **A.       A stop to be unreasonable?**

8             **I'm sorry, could you please just clarify that?**

9    Q.    Sure.

10        Do you know how Mr. Folks got the injuries that

11   he received and were documented at the hospital?

12             MR. BACEVICE:             Objection.

13                  Go ahead and answer.

14   **A.       No.**

15   Q.    Given the facts of you told us -- as you told us

16   to them [sic] about putting Mr. Folks into the car, was

17   there any reason that Mr. Folks should be injured from

18   being put into the police car?

19             MR. BACEVICE:             Object.

20   **A.       No.**

21   Q.    Do you know what the Fourth Amendment is?

22             MR. BACEVICE:             Objection.

23                  Go ahead.

24   **A.       Not verbatim.**

25   Q.    Do you know what the gist of it is?

Page 90

```
1          MR. BACEVICE:              Same
2          objection.
3   A.      Yes.
4   Q.      What's the gist of it?
5          MR. BACEVICE:              Same
6          objection.
7   A.      It relates to search and seizure.
8   Q.      Is that -- when you think of the Fourth
9   Amendment, is that what you think of?
10  A.      Yes.
11  Q.      And when you think of seizure, what about
12  seizure do you think of?
13  A.      When you take someone from one place and stop
14  them from moving or take them somewhere else.
15  Q.      So we requested your personnel file from the
16  City of Cleveland, which they turned over.  We then
17  took those documents and we Bates stamped them, we put
18  little numbers on the bottom of them so that we knew
19  what was in the file so that we could refer to them.
20          So I'm going to show you documents that have
21  been given to us by the City of Cleveland and they have
22  our Bates stamp numbers on them.  Okay?
23  A.      Okay.
24  Q.      I'm going to ask you to identify what they are.
25          MR. MALIK:                Do you want me
```

Page 91

```
 1                    to show them to you first, Jack?
 2          MR. BACEVICE:              You know, you
 3          just have one copy?
 4          MR. MALIK:                 Yeah, that's
 5          the problem.
 6          MR. BACEVICE:              Yeah, just let
 7          me peek at it because I'm familiar with
 8          the whole thing.
 9               Go ahead.
10 BY MR. MALIK:
11 Q.    Handing you Bates stamp numbers 21 to 24, can
12 you identify what that is?  And that we will make
13 Exhibit 3.
14               (Thereupon, Plaintiffs' Exhibit 3 to
15          the deposition of OFFICER AARON PETITT was
16          marked for identification.)
```

**17 A.    This is a letter advising me of the**
**18 administrative pre-disciplinary hearing that I was to**
**19 attend on Thursday, June 13th, 2013 in the conference**
**20 room with the chief of police to address an internal**
**21 affairs investigation where I was alleged to have**
**22 engaged in improper procedure.**

```
23 Q.    And what was the improper procedure you were
24 alleged to have engaged in?
25          MR. BACEVICE:              David, can I
```

Page 92

1          have a standing objection to --

2          MR. MALIK:                Sure.

3          MR. BACEVICE:             -- this line

4          of questioning and the exhibit?

5               Thank you, and go ahead and answer

6          all the questions.

7   **A.    Would you like me to read through the**

8   **specifications of what it states on here?**

9   Q.     Well, can you summarize them?

10  **A.    Specification 1 states that I failed to bring**

11  **equipment as was ordered.**

12         **Specification 2 states that I failed to**

13  **acknowledge an order.**

14         **Specification 3 states that I forwarded a**

15  **mutinous and insolent Form 1.**

16         **Specification 4 states that I used sick leave**

17  **that the city stated indicated it was being used to**

18  **avoid undesirable duty.**

19  Q.     And what was -- that's a disciplinary letter.

20  Correct?

21  **A.    Correct.**

22  Q.     And do you recall receiving that?

23  **A.    Yes, I do.**

24  Q.     So is that a fair and accurate copy of what the

25  city gave you?

1   **A.      Yes, it is.**

2   Q.      And what was the outcome of that disciplinary

3   letter?

4   **A.      The end result of the discipline was all of**

5   **these charges were thrown out and I pled to not**

6   **informing a supervisor of transporting an arrest.**

7   Q.      Did you get any time off?

8   **A.      Yes.**

9   Q.      How much?

10  **A.      10 days.**

11  Q.      Did you get any retraining after that?

12  **A.      No.**

13  Q.      Can I have that?

14          Some of these are duplicative, so I'm not going

15  to ask you about them twice.

16          MR. BACEVICE:              Do you have

17          other disciplinary stuff you're going to

18          ask about?

19          MR. MALIK:                 Yeah.

20          MR. BACEVICE:              Okay.  Can I

21          just have a standing objection to all --

22          MR. MALIK:                 You may.

23          MR. BACEVICE:              -- disciplinary

24          questions as well?

25              Thank you, Mr. Malik.

**Hoffmaster & Barberic, Inc.**
**(216) 621-2550**

Page 94

```
 1              MR. MALIK:                You may.
 2                   (Thereupon, Plaintiffs' Exhibit 4 to
 3              the deposition of OFFICER AARON PETITT was
 4              marked for identification.)
 5  BY MR. MALIK:
 6  Q.     Handing you Exhibit No. 4 which is Bates stamped
 7  0 number 126, can you identify that?
 8  A.     This is a letter that I sent to the Civil
 9  Service Commission requesting to be reinstated as a
10  Cleveland Police Officer.
11  Q.     And was that subsequent to your completely
12  resigning from the force?
13  A.     Yes.
14  Q.     Okay.  And what was the outcome of that?
15  A.     I was reinstated as a Cleveland Police Officer.
16  Q.     Handing you -- and that's a fair and accurate
17  copy of your letter?
18  A.     Yes, it is.
19                   (Thereupon, Plaintiffs' Exhibit 5 to
20              the deposition of OFFICER AARON PETITT was
21              marked for identification.)
22  Q.     Handing you Bates stamp 0180, can you identify
23  -- it's 0180, 0181, and 0182 which is Exhibit 5, and
24  the letter you just read is Exhibit 4.
25              Can you identify Exhibit 5?
```

1   **A.      This is a patrol officer performance evaluation**

2   **form from Sergeant Sudy.**

3                   MR. BACEVICE:              David, can I

4                   have an objection to evaluation forms and

5                   questions, standing?

6                   MR. MALIK:                Yes.

7                   MR. BACEVICE:             Thank you,

8                   Mr. Malik.

9   BY MR. MALIK:

10  Q.     And what is an evaluation form?

11  **A.      It's a supervisor's opinion of how you are**

12  **performing.**

13  Q.     And is that a fair and accurate copy of the

14  evaluation form you received from Sergeant Sudy?

15  **A.      Yes, it is.**

16  Q.     And were there any areas of deficiency with

17  respect to the evaluation form?

18  **A.      Yes, there are.**

19  Q.     And what are those areas?

20  **A.      Listed on here is attitude toward public,**

21  **accepts constructive criticism, courteous slash tactful**

22  **with citizens, works well with others.**

23  Q.     So that's pages 180 to 182.  Correct?  And 183.

24                  MR. BACEVICE:             It's at the

25                  bottom.

Page 96

1    Q.    Or 182.  That's 180 to 182.

2    **A.    Yes.**

3    Q.    Let me see this for a second.

4         Is that a fair and accurate copy of your

5    evaluation form?

6    **A.    Yes.**

7    Q.    So according to the form, 5 is outstanding, 4

8    exceeds, 3 is satisfactory, a mark of 2 needs

9    improvement, a mark of 1, unsatisfactory.

10         This form is a mixed bag, so to speak.  Correct?

11   **A.    Correct.**

12   Q.    And with respect to teamwork, works well with

13   others, you got a 1.  Correct?

14   **A.    Correct.**

15   Q.    And attitude towards public, you received a 2.

16   Correct?

17   **A.    Yes.**

18   Q.    Accepts constructive criticism, you received a

19   2.  Correct?

20   **A.    Yes.**

21   Q.    And so on and so forth throughout the form.

22         The courteous/tactful with citizens, you

23   received a 1.  Correct?

24   **A.    Yes.**

25                    **(Thereupon, Plaintiffs' Exhibit 6 to**

**Hoffmaster & Barberic, Inc.**
**(216) 621-2550**

1              **the deposition of OFFICER AARON PETITT was**

2              **marked for identification.)**

3    BY MR. MALIK:

4    Q.      Okay.  Let's go to Exhibit No. 6.

5            Can you identify what Exhibit No. 6 is?

6                 MR. BACEVICE:              Thank you.

7    **A.      This is a Form 1 written by Sergeant Sudy.**

8    Q.      Let's go back for a minute to the prior exhibit

9    where it had the designations of 1 through 5.  Okay?

10   **A.      Okay.**

11   Q.      After you received this evaluation form did you

12   ever receive any retraining from the City of Cleveland?

13   **A.      No.**

14   Q.      Retraining in the areas that they indicated you

15   were deficient in.

16   **A.      No.**

17                 MR. BACEVICE:              I'm sorry, can

18                 I look at No. 6 again real quick?

19                 MR. MALIK:                 Sure.

20                 MR. BACEVICE:              Okay.

21                   Standing objection to the questions

22                 and to the exhibit, David?

23                 MR. MALIK:                 Okay.

24                 MR. BACEVICE:              Thank you.

25   Q.      Exhibit No, 6, is that a fair and accurate copy

1   of the letter from Sergeant Sudy to you?

2   **A.      I don't believe I've ever seen this Form 1.**

3   Q.      Okay.  Is your testimony you never received it?

4   **A.      I don't believe I've ever seen this.  This was**

5   **-- it's not addressed to me.**

6   Q.      Let me see it, please.

7           Who's it addressed to?

8   **A.      It's addressed to the lieutenant, not me.**

9   Q.      Is it about you?

10  **A.      Yes.**

11  Q.      Okay.  Would you take a look at it?

12          Would you agree with me that that letter

13  indicates, "Petitt has inordinate -- has an inordinate

14  number of duty-related injuries, use of non deadly and

15  deadly force incidents.  It appears he is lacking in

16  tact and tactics when interacting with the citizens.

17  He has been counseled by a number of supervisors with

18  no long-term positive results.  Many officers prefer

19  not to be partnered with him."

20          Did I read that accurately?

21  **A.      You did read it accurately.**

22  Q.      Let me ask you, did anybody ever talk to you

23  about this letter?

24  **A.      No.**

25  Q.      Did anybody ever tell you about these things

Page 99

1  that are indicated about you in the letter?

2  **A.    Yes.**

3  Q.    And who was that?

4  **A.    We had a meeting with another supervisor in**

5  **support of me and the acting commander at the time who**

6  **was not McCaulley.**

7  Q.    Okay.

8  **A.    In relation to taking me off the duty.**

9  Q.    Were you ever given any retraining as a result

10  of this letter or these statements?

11  **A.    No.**

12  Q.    Were you ever counseled as is indicated in the

13  letter?

14  **A.    I don't believe I ever received any formal**

15  **counseling.**

16  Q.    Do you know what Sergeant Sudy is talking about

17  when he said he has been counseled by a number of

18  supervisors with no long-term positive results?

19  **A.    She is the only supervisor I ever recall having**

20  **these issues with me.**

21  Q.    Okay.  Did she ever tell you that?

22  **A.    Yes.**

23  Q.    Did she ever tell you that many officers prefer

24  not to be partnered with you?

25  **A.    No.**

Page 100

1  Q.      But my question goes more towards, at this

2  point, what occurred as a result of this letter?

3  **A.      Nothing.**

4  Q.      Were you put back -- were you put back on duty,

5  or were you ever taken off of duty?

6  **A.      After a supervisor came to my behalf, along with**

7  **other supervisors that also came to my behalf, I was**

8  **placed back on to duty.**

9  Q.      And who was the supervisor that came to your --

10  came on your behalf?

11  **A.      Sergeant Patrick Petranic.**

12  Q.      So was there a formal hearing?

13  **A.      I don't believe it was formal.  I believe it was**

14  **more of a sit-down between the supervisors and**

15  **commander.**

16  Q.      What's the date of that letter?

17  **A.      The date on the this Form 1 is September 28th,**

18  **2010.**

19  Q.      When you had this sit-down, was there a court

20  reporter or anybody taking minutes or a record of the

21  event?

22  **A.      No.**

23  Q.      Was there a union rep there?

24  **A.      I believe so, yes.**

25  Q.      Do you recall who that was?

Page 101

1  **A.      No, I don't.**

2  Q.      And again, there wasn't any real counseling or

3  retraining after this issue came to light.  Is that

4  correct?

5  **A.      Correct.**

6  Q.      May I borrow this back?

7  **A.      Yes.**

8                    **(Thereupon, Plaintiffs' Exhibit 7 to**

9                    **the deposition of OFFICER AARON PETITT was**

10                   **marked for identification.)**

11  BY MR. MALIK:

12  Q.      Handing you Exhibit No. 7 which is page -- we're

13  jumping ahead, 55 -- 0551, can you identify what

14  No. 7 is?

15                   MR. BACEVICE:           I'm sorry,

16                   David, can I see that?

17                   MR. MALIK:              Sure, Jack.

18                   MR. BACEVICE:           Go ahead.

19  **A.      This appears to be a Form 1 written from**

20  **Sergeant Carl Hartman to Lieutenant Bruce Cutlip in**

21  **relation, it states the subject, request a recording of**

22  **copies slash hold or monitor of RTA cameras.  Signed by**

23  **Sergeant Carl Hartman.**

24  Q.      And do you know what that is for?

25  **A.      It states that's a request, the recording copy**

1    slash hold, but I've never seen this before.  I've

2    never --

3    Q.    Is that related to a case that had anything to

4    do with you?

5    A.    I don't know.  I don't see my name anywhere on

6    here in relation to it.

7    Q.    Okay.  Turning to it looks like page 582 --

8                MR. BACEVICE:          I'm sorry,

9                this is internal affairs, so I'll just

10               take a standing objection, if you don't

11               mind.

12               MR. MALIK:             Thank you.

13                   (Thereupon, Plaintiffs' Exhibit 8 to

14               the deposition of OFFICER AARON PETITT was

15               marked for identification.)

16   BY MR. MALIK:

17   Q.    Exhibit No. 8, have you ever seen that document

18   before?

19   A.    No, I have not.

20   Q.    Do you know what it is?

21   A.    It appears to be a fax receipt from a Kyocera

22   fax machine.

23   Q.    How does that relate to you?

24   A.    I don't know.

25   Q.    It was in your personnel file, that's why we're

1    asking.

2    **A.      I've never seen this before, sir.**

3                        (Thereupon, Plaintiffs' Exhibit 9 to

4                    the deposition of OFFICER AARON PETITT was

5                    marked for identification.)

6    BY MR. MALIK:

7    Q.      Okay.  Handing you pages 600 through 611,

8    Exhibit No. 8.

9                    MR. BACEVICE:              9.  Are we

10                   on --

11   Q.      9, we're on 9.  I stand corrected.  Thank you.

12                   MR. BACEVICE:            Got it.

13   Q.      600 through 611, can you identify what this is?

14   **A.      This appears to be a printout from Cleveland**

15   **Municipal Court on the front page.**

16   Q.      And does that relate to you?

17   **A.      I believe this is in relation to the case of**

18   **Mr. Folks.**

19   Q.      M-hm.  Have you seen that before?

20   **A.      No, I have not.**

21   Q.      Okay.

22   **A.      Would you like me to go through each?**

23   Q.      Well, you can, yeah, I mean, if you haven't seen

24   it.

25   **A.      Okay.  No, I've -- I've never seen this before,**

1  **sir.**

2  Q.    Okay.  If you could hand it back to me, I'd

3  appreciate it.

4  **A.     After I go through it or now?**

5  Q.    You don't have to go through it if you hadn't

6  seen it before.

7  **A.     Okay.**

8              **(Thereupon, Plaintiffs' Exhibit 10 to**

9              **the deposition of OFFICER AARON PETITT was**

10              **marked for identification.)**

11  BY MR. MALIK:

12  Q.    Handing you Exhibit No. 10,

13              MR. BACEVICE:              I think

14              earlier I got a standing to OPS and I'll

15              just reiterate the objection, if that's

16              okay.

17              MR. MALIK:              Sure.

18              MR. BACEVICE:              To the

19              document as well.  Thank you.

20  Q.    Can you identify Exhibit No. 10?

21  **A.     This states that it's a Professional Standards**

22  **Complaint Investigation for OPS Complaint 13-367 in**

23  **relation to an arrest that I assisted on with Officer**

24  **Sanderson.**

25  Q.    What page numbers are those?  682 to 688?

**Hoffmaster & Barberic, Inc.**
**(216) 621-2550**

1   **A.      Yes.**

2   Q.      Would you take a look at page 686?

3   **A.      Yes.**

4   Q.      There's a -- there's a notation in there

5   regarding you having frequent citizen complaints in

6   2012 and 2013.

7           And my question is, have you seen this before?

8   **A.      No, I have not.  I'm trying to read it right**

9   **now.**

10          **This appears to be an investigation from**

11  **Mr. Hammons.**

12  Q.      And were you told about this investigation?

13  **A.      Yes.**

14  Q.      And is there anything in that investigation that

15  you've seen that's not accurate?

16  **A.      No, I don't believe so.**

17  Q.      Okay.

18  **A.      I haven't read through the entire document.  If**

19  **you'd like me to sit here and read the whole document.**

20  Q.      Well, I want to know if -- if what's in there is

21  accurate or not accurate.

22                  THE VIDEOGRAPHER:        Would you like

23                  to go off the record?

24                  MR. MALIK:              No.  Let's

25                  stay on.

1  **A.      Yes, it's accurate to what I responded within**

2  **the complaint.**

3  Q.      Okay.

4                      (Thereupon, Plaintiffs' Exhibit 11 to

5                  the deposition of OFFICER AARON PETITT was

6                  marked for identification.)

7  BY MR. MALIK:

8  Q.      Okay.  Handing you Exhibit No. 11 which is pages

9  0854 to 0857.

10                  MR. BACEVICE:            I'll just

11                  reiterate my standing objection to OPS and

12                  the document, and go ahead.  Thank you.

13  Q.      Have you seen Exhibit No. 11 before?

14  **A.      No, I have not.**

15  Q.      Would you please take a look at it?

16  **A.      Yes.  It's a complaint that was administratively**

17  **withdrawn after being reviewed.**

18  Q.      Who withdrew it?

19  **A.      I believe it states the investigator.**

20  Q.      Was there any -- were there any consequences or

21  discipline for you related to that complaint?

22  **A.      No, there was not.**

23  Q.      You have been, correct me if I'm wrong, but you

24  have been told in the past to understand what Arizona

25  versus Gant means.  Correct?

1   **A.      I don't recall.**

2   Q.      Let me ask you a couple of questions.

3           Have you ever arrested a person and searched a

4   vehicle?

5   **A.      Yes, I have.**

6   Q.      Under what parameters are you allowed to conduct

7   a search incident to an arrest?

8                   MR. BACEVICE:              Objection.

9                       Go ahead and answer.

10  **A.      I'm not familiar with a search incident to an**

11  **arrest, but if I arrest someone in a vehicle and I'm**

12  **towing the vehicle, it's mandatory that I conduct an**

13  **inventory search and ask for a tow sheet and go through**

14  **the various areas of the vehicle as stated in the tow**

15  **sheet.**

16  Q.      Do you ever conduct -- have you ever conducted a

17  search on the street of a vehicle when you've arrested

18  somebody?

19  **A.      Yes.**

20  Q.      And under what conditions are you allowed to do

21  that?

22                  MR. BACEVICE:              Objection.

23                      Go ahead.

24  **A.      If I'm towing a vehicle or if I'm giving -- if**

25  **I've been given consent to search the vehicle.**

1  Q.     Okay.  Is that it?  Either when you've towed it

2  or when you've been given consent.

3  **A.     No.**

4              MR. BACEVICE:              Same

5              objection.

6  BY MR. MALIK:

7  Q.     What are the other possibility -- possible

8  reasons, if any, that you're allowed to search a

9  vehicle --

10             MR. BACEVICE:              Same --

11  Q.     -- after arresting a person?

12             MR. BACEVICE:              Sorry.

13                  Same objection.

14  **A.     Possible reasons from a hypothetical stance**

15  **could be open containers in the motor vehicle, could be**

16  **items of contraband or danger or weapons in plain view,**

17  **the odor of illegal substances such as marijuana**

18  **emanating from the vehicle.**

19  Q.     Are there any rules that you know of that you

20  have to follow with respect to searching a vehicle

21  incident to an arrest?

22             MR. BACEVICE:              Objection.

23                  Go ahead.

24  **A.     Yes.**

25  Q.     And what are those rules?

1    MR. BACEVICE:          Same

2        objection.

3 **A.      In relation to what?**

4 Q.    Well, can you arrest somebody and just search

5 the glove compartment of that person's vehicle?

6        MR. BACEVICE:          Objection.

7            Go ahead.

8 **A.      For no other reason, no.**

9 Q.    Can you arrest a person and just search the

10 vehicle?

11        MR. BACEVICE:          Objection.

12            Go ahead.

13 **A.      No.  An arrest does not give you the right to**

14 **just search a vehicle.**

15 Q.    And is that the rule that you follow on the

16 street?

17 **A.      Yes.**

18 Q.    Did you search Mr. Folks' vehicle?

19 **A.      I believe it was inventory prior to tow.**

20 Q.    What does that mean?

21 **A.      That it was gone through in accordance with the**

22 **tow sheet which states listing items in the vehicle**

23 **including the glove box, trunk compartment area.**

24        MR. BACEVICE:          To be clear,

25        Mr. Malik asked if you searched the

1       vehicle, Officer.

2   **A.    I don't recall.**

3   Q.     When you do the so-called inventory prior to a

4   tow, you do that on the street.  Correct?

5   **A.    Correct.**

6   Q.     So there would be an inventory sheet for

7   Mr. Folks' vehicle.  Correct?

8   **A.    Yes.**

9   Q.     You didn't find any contraband in Mr. Folks'

10  vehicle.  Did you?

11  **A.    Not that I'm aware of.**

12  Q.     There was no marijuana, there were no drugs,

13  there was nothing illicit in his vehicle.  Correct?

14  **A.    Not that I of know.**

15  Q.     There were no weapons, no guns, no knives.

16  Correct?

17  **A.    Correct.**

18  Q.     There was really no reason to search the

19  vehicle.  Correct?

20          MR. BACEVICE:              Objection.

21               Go ahead.

22  **A.    The vehicle was not searched, I believe.**

23  Q.     You're calling it an inventory prior to a tow.

24  Correct?

25  **A.    Correct.**

Page 111

1   Q.     But in doing that you use the same techniques

2   that you do for a search.  Correct?

3                  MR. BACEVICE:            Objection.

4   **A.     Correct.**

5                  **(Thereupon, Plaintiffs' Exhibit 12 to**

6                  **the deposition of OFFICER AARON PETITT was**

7                  **marked for identification.)**

8   BY MR. MALIK:

9   Q.     Let's go to Exhibit No. 12 which is pages 874 to

10  882.

11                 MR. BACEVICE:            Just reiterate

12                 my standing objection to OPS and the

13                 document.  Thank you.

14                 MR. MALIK:               Okay.

15  Q.     Looks a little bit similar but it's a different

16  document than No. 11.

17         Have you seen Exhibit No. 12 before?

18  **A.     No, I have not seen this before.**

19  Q.     Do you know what Exhibit No. 12 is?

20  **A.     It is an investigation from Investigator Hammons**

21  **in relation to a complaint from Jorge Rodriguez.**

22  Q.     Do you know Mr. Rodriguez?

23  **A.     I believe I arrested him.**

24  Q.     Can you take a look at that and tell me if

25  there's anything in there that's inaccurate?

Page 112

1    **A.      Yes, his statement is inaccurate of facts.**

2    Q.      Whose statement?

3    **A.      Mr. Jorge Rodriguez.**

4    Q.      So do you -- were there any consequences to that

5    OPS investigation to you?

6    **A.      No, there were not.**

7    Q.      Okay.  I'm going to wrap up.  I have just a few

8    other things to go through that came out of your --

9    hold on, Exhibit No. 13.

10           Do you know what Exhibit No. 13 is?

11                   (Thereupon, Plaintiffs' Exhibit 13 to

12                   the deposition of OFFICER AARON PETITT was

13                   marked for identification.)

14                   MR. BACEVICE:            Can I note my

15                   same standing objection that --

16                   MR. MALIK:               Yes.

17                   MR. BACEVICE:            -- I noted

18                   every time?

19                   Thank you.

20   **A.      This is a Form 1 from Officer Hunter to, looks**

21   **like, lieutenant Seroka in relation to Jorge Rodriguez**

22   **that he states he also observed that Mr. Rodriguez was**

23   **highly intoxicated and that they assisted in the**

24   **arrest.**

25   Q.      Had you seen that before?

1   **A.      No, I have not.**

2   Q.      Does that -- what page number is that?

3   **A.      This is marked as 0922.**

4   Q.      Does that narrative differ at all from the

5   narrative account you gave?

6   **A.      No, it does not.**

7   Q.      Okay.  Thank you.

8        I'm going to throw a couple names out at you.

9        February 27th of 2011, William Randle and Renee

10  Sanford.  Do you remember them?

11  **A.      I don't recall.**

12  Q.      In that case the records indicate you made a

13  traffic stop and there was name calling by you,

14  threats.  You told Mr. Randle to stop asking questions.

15  And then you told him to shut up or you'll open the

16  beer in the back seat of the car and charge him with

17  DUI.

18        Do you recall that?

19  **A.      No, I do not.**

20  Q.      Renee Sanford indicated you harassed her, name

21  called her, pushed her up against the car, handcuffed

22  her; called her a bitch, crack head, animal.

23        Do you recall that?

24  **A.      No, I do not.**

25  Q.      There was an instance where you fired your gun

1    five times at an individual.

2        Do you remember that?

3    **A.    Yes, I do.**

4    Q.    And do you remember the name of the person you

5    fired your weapon at?

6    **A.    No, I don't.**

7    Q.    Were there any consequences to you firing your

8    weapon at an individual?

9    **A.    No, there was not.**

10   Q.    Does the name Adam Smith mean anything to you?

11   **A.    No, it does not.**

12   Q.    Does the name Winston Toomer mean anything to

13   you?

14   **A.    No, it does not.**

15   Q.    Jolando Sims and Tiffany Giernacky?

16   **A.    No, it does not.**

17   Q.    Dartrell Miller?

18   **A.    No.**

19   Q.    Charles Horton?

20   **A.    Charles Horton, yes.**

21   Q.    Okay.  Why does that ring a bell to you?

22   **A.    I had gone to court on him over a dozen times, I**

23   **believe.**

24   Q.    Okay.  Any consequences of -- with any regard to

25   the names I've mentioned to you?

Page 115

1  **A.      Not that I recall.**

2  Q.      Jorge Rodriguez, any consequences?

3  **A.      No.**

4              MR. MALIK:                All right.

5                   I think we're done.  I'm just going

6              to talk to Sara for a minute.

7              MR. BACEVICE:             Sure.

8              THE VIDEOGRAPHER:         Off the

9              record.

10             MR. MALIK:                We'll go out.

11                  (Thereupon, there was a brief

12             recess.)

13             THE VIDEOGRAPHER:         On the record.

14             MR. MALIK:                Officer, thank

15             you.  I have no further questions.

16             MR. BACEVICE:             He'll read.

17             THE VIDEOGRAPHER:         End of record.

18                           - - -

19             (DEPOSITION CONCLUDED.)

20                           - - -

21

22

23

24

25

```
                                                    Page 116
 1   I have read the foregoing transcript from page 1
 2   through 117 and note the following corrections:
 3   PAGE       LINE               REQUESTED CHANGE
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18                     _____
19                     OFFICER AARON PETITT
20        Subscribed and sworn to before me this _____ day
21   of _____ 2015
22
23                     _____
24                     Notary Public
25        My Commission expires:   _____
```

Page 117

```
 1   State of Ohio,        ) SS:          CERTIFICATE

 2   County of Cuyahoga.  )

 3

 4        I, Janet M. Hoffmaster, a Registered Professional
     Reporter and Notary Public within and for the State of
 5   Ohio, duly commissioned and qualified, do hereby
     certify that the within-named witness, OFFICER AARON
 6   PETITT, was by me first duly sworn to tell the truth,
     the whole truth and nothing but the truth in the cause
 7   aforesaid; that the testimony then given by him was
     reduced to stenotypy, and afterwards transcribed by me
 8   through the process of computer-aided transcription,
     and that the foregoing is a true and correct transcript
 9   of the testimony so given by him as aforesaid.

10        I do further certify that this sworn statement was
     taken at the time and place in the foregoing caption
11   specified.

12
          I am not, nor is the court reporting firm with
13   which I am affiliated, under a contract as defined in
     Civil Rule 28(D).
14
15        I do further certify that I am not a relative,
     employee, or attorney of either party, or otherwise
16   interested in the event of this action.

17
          IN WITNESS WHEREOF, I have hereunto set my hand
18   and affixed my seal of office at Cleveland, Ohio, on
     this 4th day of May 2015.
19

20

21        _____
          Janet M. Hoffmaster, RPR and Notary Public
22        in and for the State of Ohio.
          My Commission expires October 8, 2017.
23

24

25
```

**Hoffmaster & Barberic, Inc.**
**(216) 621-2550**